842 P.2d 1377

**TOWNE DEVELOPMENT OF CHANDLER, INC.,**
Petitioner,

and

**The First National Bank of Boston, a national banking association,**
Intervenor,

v.

**SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF MARICOPA, the Honorable Kenneth Mangum, a judge thereof, Respondent Judge,**

**Joseph J. PAVELICH and Muriel B. Pavelich, his wife; Nicholas C. Pavelich and Judy C. Pavelich, his wife; Joshua Building Corporation, a California corporation; Joshua Homes, a California partnership, Real Parties in Interest.**

No. 1 CA–SA 92–0125.

Court of Appeals of Arizona, Division 1, Department D.

Dec. 29, 1992.

Review Denied Jan. 19, 1993.*

As Amended Jan. 26, 1993.

---

* Vice Chief Justice Moeller did not participate in     the determination of this matter.

Jennings, Strouss & Salmon by Gerald W. Alston and James M. Ackerman, Phoenix, for petitioner.

Allen, Kimerer & LaVelle by Michael J. LaVelle, Phoenix, for real parties in interest.

Fennemore, Craig by Donald R. Gilbert, Phoenix, for intervenor.

## OPINION

FIDEL, Chief Judge.

This special action concerns an attempt to cure a conflict of interest that arose when a lawyer who had represented a party on one side of a lawsuit left his law firm to join the law firm that represents the opposing side. The trial court denied a motion to bar further participation in the lawsuit by the firm the lawyer joined. The trial court found that the firm had adequately relieved the conflict by meticulously screening its new member from contact with any matter pertaining to its client in the underlying suit.

We hold that the trial court erred. Although Ethical Rule (ER) 1.11 of the Rules of Professional Conduct permits screening or isolation to relieve a similar conflict when a lawyer moves from government to private practice, movement from one private firm to another is governed by ER 1.10, which, when the moving lawyer has received client confidences, imputes absolute disqualification to the receiving firm.

## FACTS

The underlying lawsuits arise from a falling-out between parties to a joint venture. The real parties in interest ("the Paveliches")[1] were 40% owners and petitioner Towne Development of Chandler, Inc. ("Towne") was a 60% owner and managing partner in a real estate development enterprise known as Towne Chandler Joint Venture ("Joint Venture"). The First National Bank of Boston ("Bank") issued their enterprise a construction loan. The Paveliches eventually initiated litigation against

---

1. Joseph J. Pavelich, Muriel B. Pavelich, Nicholas C. Pavelich, Judy C. Pavelich, Joshua Building Corp., and Joshua Homes jointly comprise the Paveliches.

Towne, Bank, and others, and Joint Venture intervened as a defendant.[2]

In September of 1990, George Foster left the law firm of O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears ("O'Connor, Cavanagh") to join the law firm of Allen, Kimerer & Lavelle ("AK & L"). While at O'Connor, Cavanagh, Foster had represented Joint Venture in the underlying lawsuit, and had participated in common defense discussions with co-defendants Towne and Bank.[3] AK & L has represented the Paveliches from the beginning of the suit.

Before accepting employment with AK & L, Foster discussed the impending conflict of interest with John Westover, a senior partner at O'Connor, Cavanagh. In an affidavit, Westover recalls telling Foster that AK & L must erect "an ironclad ... wall" to isolate him from the firm's representation of the Paveliches. According to Foster, Westover also stated that he would contact the client and that "there would be no problem." However, Westover did not clear the matter with Towne, the managing partner of Joint Venture; nor did Foster advise Towne or Bank of his impending change of firms.

After hiring Foster, AK & L took a variety of measures to isolate him from the case and attempted to secure a waiver of the conflict in discussions with other counsel. The discussions, though differently recalled by the participants, were unsuccessful.[4] Towne, joined by Bank, moved to disqualify AK & L from further participation in the lawsuit, and the trial court denied the motion. Lauding the meticulous screening efforts undertaken by Foster and AK & L, the court stated:

[T]here is no suggestion of any inadequacy in the physical barriers established ... at Plaintiffs' law firm, nor is there any suggestion of lack of intent by the attorneys involved to maintain fidelity to their solemn commitment to protect ... the clients' right to have confidential information maintained.

In this case, the Court feels that the countervailing rights of Plaintiffs' maintaining their choice of counsel, especially when so much money and time ha[ve] been invested in this case, the societal benefit of attorneys being allowed to change employment without undue restriction and the commitment by Mr. Foster and his firm to maintain an absolute barrier to the spread of information about this case, all outweigh the possible appearance of impropriety.

Towne brought this special action to challenge the trial court's ruling, and Bank intervened to do the same. After hearing argument, we accepted jurisdiction and granted relief in a brief explanatory order issued on June 19, 1992. We took jurisdiction to relieve a conflict of interest that could not be remedied satisfactorily by appeal. We issued an explanatory order both to provide immediate relief from the conflict and to permit the Paveliches, who faced loss of chosen counsel far into the case, to seek immediate review by our supreme court. Finally, we indicated that we would follow our order with an opinion unless the supreme court chose to intervene. On October 21, 1992, the supreme court directed the trial court to proceed in accordance with our order and indicated that it would review our opinion when filed.

2. The consolidated underlying action, now pending in Maricopa County Superior Court, bears the cause numbers CV 87–22630; CV 87–38138; CV 88–12901; and CV 88–20767.

3. Foster was one of three O'Connor, Cavanagh lawyers on the case, and the firm billed Joint Venture for 130 hours of his time.

4. Attorney Michael J. Lavelle of AK & L recalls Towne's counsel, Gerald W. Alston, stating, "My clients are all right with it." According to Alston, he did not state that Towne consented to

or was "all right with" the conflict, but merely that Towne was "not outraged...." In later correspondence, both Alston and Donald Gilbert, counsel for Bank, made it clear that their clients did not consent to the conflict and insisted that Lavelle seek an opinion on the matter from the Ethical Advisory Committee of the State Bar. Lavelle initially advised them that he would seek such an opinion, but he had not done so by the time the matter was brought before the court.

## STANDING

■ Joint Venture, Foster's former client, is not a party to this special action.[5] We consider whether Towne or Bank, who were never Foster's clients, have standing to move to disqualify AK & L.

"An attorney-client relationship is said to exist when the party divulging confidences and secrets to an attorney believes that he is approaching the attorney in a professional capacity with the intent to secure legal advice." *Alexander v. Superior Court*, 141 Ariz. 157, 162, 685 P.2d 1309, 1314 (1984) (quoting *Trinity Ambulance Serv., Inc. v. G & L Ambulance Servs., Inc.*, 578 F.Supp. 1280, 1283 (D.Conn.1984)).

Towne was the managing partner of Joint Venture. Its vice president and general counsel, James B. Young, stated by affidavit that, during the time Foster represented Joint Venture, he and Foster

> had numerous contacts on an attorney-client basis.... These contacts included phone and personal conversations discussing preparation of briefs and pleadings, involving case strategy matters, the taking of the depositions of two of the plaintiffs, ... and other confidential matters.

Towne asserts that, because it shared confidential information with Foster to advance the common defense of Joint Venture and itself, it has standing to assert the conflict of interest that has arisen from Foster's joining its adversaries' firm. *See Nemours Found. v. Gilbane, Aetna, Fed. Ins. Co.*, 632 F.Supp. 418, 423–24 & n. 7 (D.Del.1986) ("a fiduciary obligation, or 'implied professional relation'" arose when one party permitted counsel for a similarly aligned party to review confidential documents in the expectation that counsel would act to advance their common interests in the suit).

Bank also asserts a "common defense" privilege because, having aligned itself with Joint Venture and Towne, it included Foster among other counsel in a lunchtime strategy session during the deposition of a bank employee.

We need not determine in this case whether a "common defense" privilege extends as far as to include Bank.[6] Co-parties sometimes find it mutually advantageous to present a common or coordinated position in a case. Such relationships are sometimes only transitory and, accordingly, entail some risk. We are reluctant to hold that a privileged relationship arises between one party and counsel for a co-party merely through discussions of common strategy.

It suffices to address Towne's standing. Towne was not merely a co-party with Joint Venture. It was the managing partner of Joint Venture. Their defense was intertwined, and Towne's general counsel communicated with Foster on behalf of both Towne and Bank in the expectation that his confidences would be kept. We conclude that Towne has standing to assert the conflict of interest that arose when Foster joined the Paveliches' firm.

■ The Paveliches argue that even if Towne has standing, it waived the conflict through the oral comments of its lawyer, Gerald W. Alston. We cannot agree.

The Paveliches attribute waiver to a phone conversation between their lawyers that the participants differently recall. LaVelle recalls Alston stating, "My clients are all right with it." Alston says he merely stated Towne was "not outraged." LaVelle and Alston do not accuse each other of bad faith; each concedes that the other may have understood their conversation differently. Rule 80(d), Arizona Rules of Civil Procedure, provides:

> *Agreement or Consent of Counsel or Parties.* No agreement or consent between parties or attorneys in any matter is binding if disputed, unless it is in writ-

---

5. Joint Venture won a motion for summary judgment against the Paveliches in the trial court, which is now the subject of a separate appeal.

6. In our order of June 19, 1992, we concluded that the Bank had standing. We have retreated from that holding in this opinion because it is unnecessary to this opinion, and we prefer to rest on narrower ground.

ing, or made orally in open court, and entered in the minutes.

Rule 80(d) "contains no limitations on the type of agreements to which it applies...." *Canyon Contracting Co. v. Tohono O'Odham Hous. Auth.*, 172 Ariz. App. 389, 391, 837 P.2d 750, 752 (App.1992). In contemplation of precisely such misunderstandings as have arisen in this case, the rule serves to relieve the courts from choosing between conflicting recollections of advocates whose interests diverge. *Id.* at 393, 837 P.2d 750, 754. Because the Paveliches "didn't get it in writing," they cannot attribute waiver or consent to Towne.

■ Moreover, if LaVelle's version of the conversation were accepted as more accurate, the issue of authority would arise. Alston has made it clear that he was not authorized to waive the conflict; in correspondence with LaVelle, he repeatedly stated Towne's objection, not its consent; and Towne is emphatic by affidavit "that it never gave consent." "Whether an attorney, as his client's agent, has authority to bind his client is a question of fact...." *Hays v. Fischer,* 161 Ariz. 159, 163, 777 P.2d 222, 226 (App.1989). The evidence does not establish such authority in this case.

## IMPUTED DISQUALIFICATION

■ Because at least Towne has standing to raise the issue, we turn to whether AK & L can relieve itself of disqualification by isolating Foster from this and every other Pavelich file. We readily accept the trial court's conclusion that the firm and Foster have scrupulously maintained the wall. We do not question their good faith. Unfortunately, these efforts do not suffice.

The issue is governed by ER 1.10. The applicable provisions are ER 1.10(b) and (d):

(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by ER 1.6 and 1.9(b) that is material to the matter.

\* \* \* \* \* \*

(d) A disqualification prescribed by this Rule may be waived by the affected client under the conditions stated in ER 1.7.

17A Ariz.Rev.Stat.Ann.Sup.Ct.Rules, Rules of Professional Conduct, Rule 42, ER 1.10(b) and (d) (1988).

■ The language of ER 1.10 is absolute. When, as in this case, the moving lawyer has acquired protected information,[7] the rule admits waiver or consent as the only exception to imputed disqualification of the receiving firm. This mandatory bright line was drawn in deliberate contradistinction to ER 1.11, which permits a screening solution when lawyers move from government practice to private firms.[8] *See Turbin v. Superior Court,* 165 Ariz. 195, 197–98, 797 P.2d 734, 736–37 (App. 1990) (discussing the different standards of ER 1.10 and 1.11).

The drafters of ER 1.10 debated and rejected a screening solution for moves within the private sector. Geoffrey C. Hazard Jr. & W. William Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* 332–34 (2d

7. The comment to ER 1.10 provides that ER 1.10 "operate[s] to disqualify the firm only when the lawyer involved has actual knowledge of [protected] information...."

8. ER 1.11(a), entitled "SUCCESSIVE GOVERNMENT AND PRIVATE EMPLOYMENT," provides in part:

Except as law may otherwise expressly permit, a lawyer shall not represent a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee,

unless the appropriate government agency consents after consultation. No lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter unless:

(1) the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom; and

(2) written notice is promptly given to the appropriate government agency to enable it to ascertain compliance with the provisions of this rule.

ed.1991); *see also Lansing–Delaware Water Dist. v. Oak Lane Park, Inc.*, 248 Kan. 563, 808 P.2d 1369, 1377 (1991). The purpose of the rigorous disqualification provision of the rule is to reasonably assure "the client previously represented ... that the principle of loyalty to the client is not compromised." ER 1.10 cmt. In commentary to the rules, the drafters explain why the standard of ER 1.11 is less severe:

> The government is entitled to protection of its client confidences.... However, if the more extensive disqualification in ER 1.10 were applied to former government lawyers, the potential effect on the government would be unduly burdensome. The government deals with all private citizens and organizations, and thus has a much wider circle of adverse legal interests than does any private law firm. In these circumstances, the government's recruitment of lawyers would be seriously impaired if ER 1.10 were applied to the government. On balance, therefore, the government is better served in the long run by the protections stated in ER 1.11.

ER 1.10 cmt.; *see also* ER 1.11 cmt.

When in 1985 the Arizona Supreme Court adopted the Model Rules of Professional Conduct, it incorporated not only the rules but the drafters' comments into Rule 42, Rules of the Supreme Court. Thus, the comments that explain the deliberate distinction between ER 1.10 and 1.11 are themselves a part of Arizona law.

We are aware that a subsequent, countervailing line of thought has emerged. *See Restatement of the Law: The Law Governing Lawyers*, § 204(2) (Tent. Draft No. 4, 1991).[9] However, we do not examine the merits of the emerging view. Whether the Arizona Rules of Professional Conduct should be revised is an issue for another forum and another day. This case is governed by the drafters' explicit and recorded intent at the time the current rules were passed.

ER 1.10, as adopted in Arizona, rejects walling off a tainted attorney as an alternative to imputed disqualification of the firm. For this reason, we have accepted jurisdiction and granted relief.

EHRLICH, P.J., and GARBARINO, J., concur.

---

9. The members of the American Law Institute have recently approved screening as an alternative to imputed disqualification for moves within the private sector under the following conditions:

> (a) The confidential client information communicated to the personally-prohibited lawyer is not likely to be significant in the later case;
> (b) Adequate screening measures are in effect to eliminate involvement by the personally-prohibited lawyer in the representation; and
> (c) Timely and adequate notice of the screening has been provided to all affected clients....

*Restatement of the Law: The Law Governing Lawyers*, § 204(2) (Tent. Draft No. 4, 1991); *see also ABA/BNA Lawyers' Manual on Professional Conduct*, 7 Current Reports 155 (June 5, 1991). The screening provisions have been hotly disputed, and Associate Reporter Thomas Morgan, a law professor at George Washington University, describes § 204 as "perhaps the most difficult single section" of the restatement to date. *Id.*