876 P.2d 1176

**SMART INDUSTRIES CORP., MFG., and Lutes Enterprises, Inc., Petitioners,**

**v.**

**SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF YUMA, The Honorable H. Stewart Bradshaw, a judge thereof, Respondent Judge,**

**Darryl and Marilyn ST. GERMAINE, Real Parties in Interest.**

No. 1 CA–SA 93–0320.

Court of Appeals of Arizona, Division 1, Department E.

April 7, 1994.

Review Denied July 28, 1994.

Mower, Koeller, Nebeker, Carlson & Haluck by Constance J. Miller, Yuma, for petitioner Smart Industries Corp.

Jones, Skelton & Hochuli by Mark D. Zukowski, Phoenix, for joined petitioner Lutes Enterprises, Inc.

Don B. Engler, Yuma, for real parties in interest.

## OPINION

JACOBSON, Presiding Judge.

Petitioner Smart Industries, a defendant in the underlying personal injury suit, seeks review of the trial court's denial of its motion to disqualify plaintiffs' lawyer after defendant's counsel's former legal assistant was hired by plaintiffs' lawyer.[1] This special action requires us to decide whether the same rules of imputed disqualification that apply to lawyers also apply to nonlawyer personnel who change employment between law firms.

Acceptance of special action jurisdiction in this matter is appropriate because it involves a question of law that could not be satisfactorily remedied by appeal. *See Towne Dev. of Chandler, Inc. v. Superior Court,* 173 Ariz. 364, 366, 842 P.2d 1377, 1379 (App.1992) (accepting special action jurisdiction from an order denying a motion to disqualify); *see also Carlson v. Langdon,* 751 P.2d 344, 350 (Wyo.1988) (certiorari granted to review re-

---

1. Petitioner Lutes Enterprises, Inc. (Lutes) has joined in the petition for special action. The St. Germaines have conceded Lutes' standing, as a co-defendant in the underlying suit, to join in the petition. *See Towne Dev. of Chandler, Inc. v.* *Superior Court,* 173 Ariz. 364, 367, 842 P.2d 1377, 1380 (App.1992). For convenience, however, we collectively refer to both petitioners in this action as "Smart."

fusal to disqualify because "waiting until the conclusion of the case on the merits would not have been beneficial to the parties and could have resulted in injustice"). Moreover, this is an issue of first impression in Arizona that has statewide ramifications for the practice of law. *See Alexander v. Superior Court*, 141 Ariz. 157, 161, 685 P.2d 1309, 1313 (1984).

### *Factual Background*

In December 1990, real parties in interest Darryl and Marilyn St. Germaine (collectively, "the St. Germaines" or "plaintiffs"), through their former lawyer Richard D. Engler, filed a personal injury suit alleging products liability and premises liability against Smart and other defendants. The St. Germaines subsequently retained their present counsel, Don B. Engler, the brother of Richard D. Engler, to represent them in this action. Don Engler is a sole practitioner in Yuma.

Smart retained the law firm of Mower, Koeller, Nebeker, Carlson & Haluck ("Mower, Koeller") to defend it in that litigation. The Yuma office of Mower, Koeller consists of two lawyers and three support staff. Cocounsel Constance Miller and William A. Nebeker of that firm worked on the case. Ms. Miller also worked with her secretary, Janet Gregston, who has been employed "in a secretarial/paralegal capacity" at Mower, Koeller since September 1991. According to Ms. Miller's affidavit, Ms. Gregston's paralegal duties involved extensive work on the St. Germaine/Smart litigation:

> [Ms. Gregston] worked extensively [on this case] in numerous confidential settings.... [She] was privy to exhaustive client confidences, correspondences between counsel and clients, strategic planning, litigation preparation and documentation, pretrial conferences with clients, lay and expert witnesses. She participated in

the preparation of trial exhibits and is shown in one test video which may be presented at trial.

According to counsel for Lutes, Ms. Gregston participated in numerous discussions with co-defendants, clients, and experts, involving strategic planning for a cooperative defense.

On October 8, 1993, approximately 60 days prior to the firm trial date, Ms. Gregston suddenly terminated her employment at Mower, Koeller.[2] On October 18, 1993, she began new employment as a legal secretary for plaintiffs' lawyer Don Engler. According to Mr. Engler's avowal to the court:

> [C]ontrary to Mrs. Gregston's duties while in Ms. Miller's employ ... her duties [in Engler's employ] do not include a broad spectrum of "paralegal" tasks. To the contrary, Mrs. Gregston was employed to perform the specific professional duties of a legal secretary.
>
> This means that Mrs. Gregston is responsible only to prepare those pleadings, motions and correspondence which [Engler] dictates, in conformance with [his] directions. Mrs. Gregston's contact with clients generally, and in this case in particular, is limited to receipt of telephone messages and placing of telephone calls for the undersigned.

Mr. Engler also avowed that he had given "specific and segregated authority" to a separate paralegal with her own secretary for "[a]ll matters relating to discovery, client conferences, preparation of discovery motions for final review ..., trial exhibits, and pretrial statements ..." and that "Mrs. Gregston has no responsibility in regards to these matters whatsoever." Similarly, Ms. Gregston's affidavit states that, prior to her employment with Mr. Engler, she was informed that she would not be asked to reveal any confidences she had learned in her prior employment, and to report to Mr. Engler if

---

**2.** There are several factual allegations before this court regarding the circumstances of this job change. Those allegations, however, were not before the trial court when it ruled on the motion to disqualify; thus, they are not properly before this court now.

Accordingly, we grant Smart's motion to strike portions of the response to the petition for spe-

cial action that contain factual information not presented to the trial court, including Appendix B, Ms. Gregston's affidavit of December 27, 1993. We will not consider those portions of the record in addressing this issue.

In light of this ruling, we need not address the additional question whether the St. Germaines exceeded the page limitation in their response.

she were ever questioned by anyone in the office regarding her knowledge gained from her employment at Mower, Koeller. However, Ms. Gregston's initials and signature appear on several pleadings in this case, both in the underlying litigation and in special action papers filed in this court. Thus, it is apparent she is presently performing secretarial work on this case.

On November 15, 1993, Smart filed a motion to disqualify Engler as plaintiffs' counsel, based on imputed disqualification of Engler's firm under ER 1.10, Rule 42, Rules of the Arizona Supreme Court,[3] because of Ms. Gregston's employment by Engler.[4] The motion relied heavily on the California case of *In re Complex Asbestos Litigation*, 232 Cal.App.3d 572, 283 Cal.Rptr. 732 (Dist. 1 1991).

In response, Mr. Engler argued that ER 1.10 had no application in a nonlawyer context, and that California case law was distinguishable. Furthermore, he contended, he had met the requirements of the applicable ethical rule, ER 5.3,[5] by instructing Ms. Gregston not to divulge confidences. Thus, he concluded, disqualification was not required.

At a hearing on the motion, the trial court questioned its authority to order disqualification based on the conduct of a nonlawyer. The court subsequently ruled as follows:

> The issue covered by this order is whether the plaintiffs' attorney must be disqualified to continue to act by reason of the fact that he has hired a secretary/legal assistant who formerly worked for counsel for a defendant and who, it is contended, did a great deal of work on this case and has considerable "inside information" about the case.
>
> ....
>
> Plaintiffs' counsel has contended that he has studiously insulated himself from any possible knowledge his employee might have, and the court accepts this as true.
>
> Were this an attorney there would be absolutely no doubt in the court's mind that disqualification would be proper. This is not an attorney.
>
> Not being an attorney, two thoughts are raised.
>
> The first is that the court really has no method of protecting the privilege of confidentiality which Ms. Miller's client is entitled to enjoy.
>
> The second is that there is no code of conduct in place which would guide a lawyer. The code of conduct is that of the employer.
>
> The upshot of all of this is that the continued representation of the plaintiff by her attorney and a defendant attorney's former employee looks bad. It cannot be but perceived by the public that something fishy is going on. Thus, it smells bad, too.
>
> However bad it may appear, mere appearance of evil is not a sufficient basis for the court to disqualify an attorney. While it may be that he should, ethically, withdraw, the court is not in a position to force the issue.
>
> ORDERED that the motion to disqualify plaintiffs' counsel is overruled.

---

**3.** ER 1.10(b), Rule 42, Rules of the Arizona Supreme Court, provides as follows:

(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by ER 1.6 and 1.9(b) that is material to the matter.

**4.** Smart also requested an opinion from the Arizona State Bar, which declined to address the issue in the context of this ongoing litigation.

**5.** ER 5.3, Rule 42, Rules of the Arizona Supreme Court, provides as follows:

(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and

(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the rules of professional conduct if engaged in by a lawyer if:

(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved....

Smart petitioned for special action from this order.

### *Discussion*

#### A. *Standard of Review*

▮ Rulings on disqualification motions are within the discretion of the trial court, limited only by the applicable legal principles. *See, e.g., In re Complex Asbestos Litigation*, 283 Cal.Rptr. at 739. Our review is thus limited to a determination whether the trial court abused its discretion. *Id.*

#### B. *Application of Ethical Rules to Disqualification Motions*

The trial court apparently questioned its authority to disqualify a lawyer based on the conduct of a nonlawyer, when that conduct falls outside the scope of the disciplinary system. Smart argues that the court's ruling therefore may have constituted a failure to exercise discretion, as much as an abuse of discretion. As a preliminary matter, then, we determine the basis for the trial court's authority to disqualify a lawyer based upon employment of nonlawyer personnel.

The relationship between ethical rules and litigation motions is usually not addressed by cases reviewing litigation disqualification motions that are based on ethical breaches. In 1983, our supreme court enacted Rule 42, Rules of the Arizona Supreme Court, which adopts the Model Rules of Professional Conduct (Model Rules), for the following purpose:

The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule. Accordingly, nothing in the rules should be deemed to augment any substantive legal duty of lawyers or the extra-

disciplinary consequences of violating such a duty.

Moreover, these rules are not intended to govern or affect judicial application of either the attorney-client or work product privilege.

Rule 42, Preamble, Scope. Nevertheless, as one authority has observed:

[T]he imputed disqualification rules have rarely been enforced through the disciplinary process. Instead, the courts have developed a body of common law on this matter in the context of deciding motions to disqualify (and vicariously disqualify) counsel in the course of litigation....

Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* (Student ed. 1985) at 188.

A trial court's authority to apply an ethical rule to govern a disqualification motion in a litigation setting derives from the inherent power of the court to control judicial officers in any proceeding before it. *See In re Complex Asbestos Litigation*, 283 Cal.Rptr. at 739. As one court has defined this inherent authority:

Attorney disqualification of counsel is a part of a court's duty to safeguard the sacrosanct privacy of the attorney-client relationship which is necessary to maintain public confidence in the legal profession and to protect the integrity of the judicial process.

*Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1576 (Fed.Cir.1984).

The trial court's quandary in this case, however, was that the disqualification motion was based on the conduct of a nonlawyer, over whom the Model Rules have no effect in a disciplinary setting. However, as both Smart and the St. Germaines point out, the operation of ER 1.10(b) may be extended to the conduct of nonlawyers through ER 5.3. This duty imposes on a lawyer the duty to supervise a nonlawyer employee, which includes "reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer...." ER 5.3(b). The duty of supervision also includes lawyer responsibility for any nonlawyer con-

duct "that would be a violation of the rules of professional conduct if engaged in by a lawyer," if the lawyer orders, has knowledge of, or ratifies such conduct. ER 5.3(c).

ER 5.3 does not place on the lawyer an "imputed liability" for the actions of the non-lawyer employee, but rather creates an independent duty of supervision:

> This different formulation is necessary because nonlegal assistants or associates of a lawyer cannot be held to exactly the same professional standards as are lawyers. A good example of how lawyers must supervise their nonlawyer assistants arises in a situation in which the duty of confidentiality is applicable.... [T]hose who supervise nonlegal assistants, such as secretaries and paraprofessionals, must take steps to see that breaches of confidentiality "incompatible" with Rule 1.6 do not occur through the actions of such personnel.

Hazard & Hodes, *supra*, at 463–64. In Arizona, ER 1.6 preserves client confidences under the disciplinary rules, as does the statutory attorney-client privilege in the litigation setting. *See* A.R.S. § 12–2234 (1982). We note that the protection of a client's confidences through this statutory privilege has been extended to apply to paralegals as well as secretaries, based on the law's recognition of the necessary role of nonlawyer assistants in modern litigation practice. *Samaritan Foundation v. Superior Court*, 173 Ariz. 426, 432–33, 844 P.2d 593, 599–600 (App.1992), *vacated in part on other grounds*, 176 Ariz. 497, 862 P.2d 870 (1993) ("a lawyer does not forfeit the attorney-client privilege by receiving otherwise privileged client communications through the conduit of a properly supervised paralegal employee").

 The lawyer's duty of supervision over, and responsibility for, the conduct of a nonlawyer assistant under ER 5.3 clearly encompasses the protection of client confidences communicated to a nonlawyer assistant, such as a paralegal or secretary. *See id.* at 433 n. 8, 844 P.2d at 600 n. 8 (obligations over nonlawyer include insuring client confidentiality). Under these combined principles, we conclude that a trial court has authority, in a litigation setting, to disqualify counsel on the basis of a nonlawyer assistant's conduct that would violate an ethical rule protecting a client's confidential communications to a lawyer. Therefore, to the extent that the trial court's ruling in this case may have been based on the erroneous assumption that it lacked authority to disqualify a lawyer based on the conduct of a nonlawyer, that ruling constitutes a failure to exercise discretion necessary "to safeguard the sacrosanct privacy of the attorney-client relationship which is necessary to maintain public confidence in the legal profession and to protect the integrity of the judicial process." *See Panduit*, 744 F.2d at 1576; *see also* Rule 3(a), Arizona Rules of Special Actions (special actions may address failure of judicial officer "to exercise discretion which he has a duty to exercise").

## C. *Application of Imputed Disqualification Rules to a Nonlawyer Assistant*

Having concluded that a trial court has the authority, in a litigation context, to disqualify counsel based on the conduct of a nonlawyer assistant that is incompatible with the lawyer's ethical obligations, we turn next to the standard to be applied in determining whether disqualification is mandated under the facts of this case.

This is a case of first impression in Arizona. Indeed, we note that very few jurisdictions have considered the issue, either in the context of litigation case law or in ethical opinions. Those that have addressed the issue tend to apply the same standards to nonlawyers as are applied to lawyers under the jurisdiction's applicable disciplinary rules regarding imputed disqualification. *See, e.g., Kapco Mfg. Co. v. C & O Enterprises, Inc.*, 637 F.Supp. 1231 (N.D.Ill.1985) (applying seventh circuit case law relating to imputed disqualification of lawyers); *In re Complex Asbestos Litigation*, 232 Cal.App.3d 572, 283 Cal.Rptr. 732 (Dist. 1 1991) (applying lawyer disqualification rules to nonlawyer assistants); *Glover Bottled Gas Corp. v. Circle M. Beverage Barn, Inc.*, 129 A.D.2d 679, 514 N.Y.S.2d 441 (1987) (affirming disqualification based on conduct of nonlawyer violative of lawyers' duties under Code of Professional Responsibility); Kansas Bar Ass'n Ethical

Op. No. 90–555 (1992) ("screening wall" inappropriate to save lawyers from disqualification under ER 1.10(b) also inadequate for nonlawyers); New Jersey State Bar Op. 665 (1991) (screening mechanisms that allow young lawyers to move between law firms applied to prevent disqualification of paralegal).

Thus, if, under the jurisdiction's applicable ethical rules, a lawyer can be saved from imputing disqualification to his or her new firm by appropriate screening mechanisms, then a paralegal's or secretary's potential conflict in the new firm can be avoided by the same mechanisms, sometimes described as "Chinese Walls," or "cones of silence." *See, e.g., Kapco; In re Complex Asbestos Litigation.* However, if the jurisdiction does not recognize such a "screening" option as adequate protection against a lawyer's potential conflict in the new firm, then it usually does not recognize such an exception to the imputed disqualification rule for a nonlawyer assistant. *See, e.g., Glover Bottled Gas Corp.;* Kansas Bar Ass'n Ethical Op. No. 90–555.

▮ Arizona law does not recognize screening devices to avoid imputed disqualification of the new law firm to which a lawyer moves when that lawyer possesses client confidences and the new firm has interests adverse to that client. *Towne,* 173 Ariz. at 369, 842 P.2d at 1382. In *Towne,* we interpreted ER 1.10(b) and the comments thereto, as adopted by our supreme court, to require that, when a lawyer in possession of client confidences moves from one firm to another, that movement imputes absolute disqualification to the new firm in any matter materially adverse to the client. *Id.* at 365, 842 P.2d at 1378. We adopted the trial court's conclusion that the firm and the lawyer had "scrupulously maintained" an ironclad wall to screen him from any adverse representation of the client undertaken by the new firm.[6]

*Id.* at 368, 842 P.2d at 1381. However, we concluded:

> Unfortunately, these efforts do not suffice.
>
> . . . .
>
> The language of ER 1.10 is absolute. When, as in this case, the moving lawyer has acquired protected information, the rule admits waiver or consent as the only exception to imputed disqualification of the receiving firm. This mandatory bright line was drawn in deliberate contra-distinction to ER 1.11, which permits a screening solution when lawyers move from government practice to private firms. . . .
>
> The drafters of ER 1.10 debated and rejected a screening solution for moves within the private sector. . . . The purpose of the rigorous disqualification provision of the rule is to reasonably assure "the client previously represented . . . that the principle of loyalty to the client is not compromised." ER 1.10 cmt. . . .
>
> . . . .
>
> ER 1.10, as adopted in Arizona, rejects walling off a tainted attorney as an alternative to imputed disqualification of the firm.

*Id.* at 368–69, 842 P.2d at 1381–82 (citations and footnotes omitted). Although the court recognized the existence of an emerging countervailing view in favor of screening, it declined to examine that line of thought in light of "the drafters' explicit and recorded intent at the time the current rules were passed." *Id.* at 369, 842 P.2d at 1382.

Because Arizona does not recognize the "cone of silence" or other screening mechanisms as an exception to a lawyer's imputed disqualification of the new firm, we do not find persuasive cases from those jurisdictions that have adopted the opposite rule, such as the seventh circuit.[7]

---

**6.** Likewise, in this case we accept as true, as did the trial court, plaintiffs' counsel's contention that "he has studiously insulated" himself from any possible knowledge that Ms. Gregston might have regarding Smart's client confidences. As in *Towne,* "We do not question their good faith." *Id.*

**7.** The seventh circuit has utilized a three-step analysis in deciding motions to disqualify coun-

sel: (1) whether a "substantial relationship" exists between the subject matter of the prior and present representation; if so, a rebuttable "presumption of shared confidences" arises by virtue of the lawyer's employment in the new firm; (2) whether the presumption of shared confidences has been rebutted regarding the prior representation by establishing that the lawyer was not privy to the client's confidences at the old firm; (3) whether the presumption of shared confidences

We are also reluctant, however, to adopt the reasoning of those jurisdictions that have declined to adopt the "cone of silence" screening defense for lawyers, but then have blindly applied this rule to the analogous nonlawyer situation without first examining whether any distinction exists between the two situations. *See, e.g.,* Kansas Bar Ass'n Ethics Op. No. 90–555 (committee feels constrained by Kansas case law rejecting screening wall for lawyers under ER 1.10(b) to reject screening as an alternative for paralegals through operation of ER 5.3). In this regard, we find informative the analysis and reasoning of an informal ethics opinion of the American Bar Association. *See* 67 ABA/BNA *Lawyers' Manual of Professional Conduct* 901:318 (Aug. 31, 1988), ABA Informal Opinion 88–1526 (June 22, 1988): *Imputed Disqualification Arising From Change in Employment By Nonlawyer Employees* (hereafter, "ABA Informal Opinion").

In ABA Informal Opinion, the Committee was asked whether, under the Model Rules, a law firm that hires a paralegal who was formerly employed by another lawyer must withdraw from representation in a matter adverse to a client of the former firm about whom the paralegal had obtained substantial information relating to the suit. The employing firm proposed to "screen the paralegal from receiving information about or working on the lawsuit and will direct the paralegal not to reveal any information relating to the representation of the sole practitioner's client gained by the paralegal during the former employment." *Id.* at 318. Although acknowledging that ER 1.10(b) does "not recognize screening the *lawyer* from sharing the information in the employing firm as a mechanism to avoid disqualification of the entire firm" (emphasis added), the Committee nonetheless found screening the *nonlawyer* to be an acceptable alternative to disqualification of the new firm, for the following reasons:

In the case of nonlawyers changing firms, however, additional considerations are present which persuade the Committee that the functional analysis [of the seventh circuit] in *Kapco* is more appropriate than would be a rule requiring automatic disqualification once the nonlawyer is shown to have acquired information in the former employment relating to the representation of the opponent.

It is important that nonlawyer employees have as much mobility in employment opportunity as possible consistent with the protection of clients' interest. To so limit employment opportunities that some nonlawyers trained to work with law firms might be required to leave the careers for which they are trained would disserve clients as well as the legal profession. Accordingly, any restrictions on the nonlawyer's employment should be held to the minimum necessary to protect confidentiality of client information.

*Id.* at 320. We note that a similar "issue of fairness" was recognized by the Kansas Bar Association even though it ultimately rejected screening of nonlawyers as an alternative to disqualification:

A rigid rule of "if the employee possess[es] information which if possessed by an attorney is a conflict, the hiring firm is disqualified" raises important questions, not the least of which is the anomalous proposition that the more skilled a legal assistant or other employee becomes to the employer and the more information he or she acquires on cases in the firm, such assistant becomes *less* valuable to other firms with significant caseloads with the current employer.... [A] literal reading [of this rigid rule] would stymie a legal assistant's career, or at the very least make them "Typhoid Marys," unemployable by firms practicing in specialized areas of the law

has been rebutted regarding the present representation by the use of "specific institutional mechanisms (e.g., 'Chinese Walls')" to "effectively insulate" against "any flow of confidential information from the 'infected' attorney to any other member of his present firm." *Schiessle v. Stephens,* 717 F.2d 417, 420–21 (7th Cir.1983);

*see also Kapco,* 637 F.Supp. at 1236–41 (applying the *Schiessle* analysis to deny disqualification based on the conduct of secretary who had changed firms).

Under *Towne,* Arizona does not recognize the third step of the *Schiessle* analysis as a means of rebutting the presumption of shared confidences.

where the employees are most skilled and experienced.

KBA Ethics Op. No. 90–005 at 6–7.

Noting this concern for the ability of non-lawyers to change employment, the California court in *Complex Asbestos Litigation* added its concern for the rights of clients to obtain counsel of their own choosing; balanced against those concerns, however, are "the need to maintain ethical standards of professional responsibility," and "the paramount concern" for "the preservation of public trust in the scrupulous administration of justice and the integrity of the bar." 283 Cal.Rptr. at 740. We too agree that all these concerns are relevant and important in determining a disqualification issue; however, we are wary of allowing a literal reading of a rule appropriate for lawyers to become a means of injustice to the parties when applied to nonlawyers if there are valid reasons to draw distinctions between them.

Such a distinction is made in our ethical rules between former government lawyers who change employment and nongovernment lawyers. *See* ER 1.11(c); *Turbin v. Superior Court*, 165 Ariz. 195, 797 P.2d 734 (App. 1990). In *Turbin*, we noted that ER 1.11(c) prohibits a government lawyer from participating in a matter with which the lawyer had previous involvement in a former employment, but, unlike ER 1.10(b), ER 1.11(c) does not require disqualification of the remaining lawyers in a government office. *Id.* at 197–98, 797 P.2d at 736–37. The reason for the difference between treatment of public and private lawyers for purposes of imputed disqualification was explained as follows:

> The salaried government employee does not have the financial interest in the success of departmental representation that is inherent in private practice.... The channeling of advocacy toward a just result as opposed to vindication of a particular claim lessens the temptation to circumvent the disciplinary rules through the action of associates....

*Id.* at 198, 797 P.2d at 737, quoting ABA Committee on Ethics and Professional Responsibility Formal Opinion 342 (1975), 62 A.B.A.J. 517 (1976). We concluded that screening the individual government lawyer "from any direct or indirect participation in the matter" would avoid vicarious disqualification. *Id.* Without such screening, however, disqualification could be justified even in the absence of a showing of actual prejudice, if appearance of impropriety were a strong factor. *Id.*

We believe that this reason for treating government lawyers differently in the context of imputed disqualification cases applies equally to nonlawyer assistants, who, unlike lawyers in private practice, generally have neither a financial interest in the outcome of a particular litigation, nor the choice of which clients they serve. Moreover, in our opinion, the public perception of what is expected of lawyers as compared to nonlawyers is different, probably based on the "independent contractor" status enjoyed by lawyers as compared to the "master/servant" role of nonlawyer assistants. Our analysis, thus, is directed to determining the scope and extent of a supervising lawyer's ethical duty under ER 5.3, to insure that a nonlawyer's conduct in this "master/servant" setting is compatible with other ethical obligations.

In ABA Informal Opinion, the Committee construed the lawyer's duty under Model Rule 5.3, to assure that a nonlawyer's conduct is "compatible" with the lawyer's ethical obligations. "Compatible" requirements to preserve confidentiality under Model Rule 5.3 in the supervision of the nonlawyer, but not "identical" to those imposed on lawyers under Model Rule 1.10(b), included the following:

> (a) appropriate instruction and supervision concerning the ethical aspects of their employment, particularly regarding the obligation not to disclose information relating to representation of the client;
>
> (b) admonitions to be alert to all legal matters, including lawsuits, in which any client of the former employer had an interest. The nonlawyer should be cautioned:
>
> > (1) not to disclose any information relating to the representation of a client of the former employer;
> >
> > *and*
> >
> > (2) *that the employee should not work on any matter on which the employee*

*worked for the prior employer or respecting which the employee has information relating to the representation of the client of the former employer.*

*Id.* at 320–21 (emphasis and blocked format added).

■ We conclude that the screening requirements articulated above are sufficient to satisfy a lawyer's duty under ER 5.3 to supervise a nonlawyer employee in a manner that will assure conduct "compatible" with the lawyer's ethical obligations. Thus, satisfaction of these requirements will prevent disqualification of the firm based on a nonlawyer's potential conflict even though a stricter standard is imposed on lawyers by operation of ER 1.10(b). *See Towne.* We reach this result because we agree with the concerns of ABA Informal Opinion and the cases cited therein regarding the employment of nonlawyer assistants within the legal community, and because we perceive that, once a supervising lawyer in the employment relationship has properly instructed and screened such an employee, the danger is small of a disclosure of a former client's confidences.[8]

■ Applying these concepts to this case, however, we conclude that Smart is entitled to disqualification of plaintiffs' counsel under the undisputed facts before us. First, there is no question that Ms. Gregston obtained client confidences in her former employment; the St. Germaines do not contend that her involvement in the case was any less than lawyer Miller has alleged. Second, there is no question that these client confidences are substantially related to the representation by her current employer; indeed, she is now on the other side of the same lawsuit, which is pending trial. It is also clear on this record that Smart did not consent to her employment by opposing counsel, nor did Smart waive its objection to her new employment.[9]

We understand that plaintiffs' counsel instructed Ms. Gregston not to divulge any client confidences gained in her former employment, and, as previously mentioned, we accept as true counsel's avowals, in both this court and the trial court, that he has insulated himself from any possible disclosure. However, this instruction and insulation do not necessarily satisfy the minimum requirements necessary under ER 5.3 to prevent disqualification. In this case, counsel does not dispute that Ms. Gregston has not been screened from participation in the actual litigation with which she was intimately involved in her former employment; rather, she has initialed and signed pleadings and correspondence in this record. She has also submitted personal affidavits as evidence, in both the trial court and in this court. Counsel's avowal that Ms. Gregston's duties are limited to typing and taking phone messages is not sufficient to remove her from involvement in the case in a manner that would significantly decrease the likelihood of a prohibited disclosure, even inadvertently. *See, e.g.,* Maryland State Bar Ethics Op. 90–17 (secretary whose duties are "limited to typing" must be screened from information about or participation in matters involving clients of her former employer); *see also LaSalle Nat'l Bank v. County of Lake,* 703 F.2d 252 (7th Cir.1983) (promise not to discuss case was inadequate screening). Furthermore, we observe that counsel's refusal, after a strong suggestion by the trial court to withdraw, to even offer to screen this employee from working on the very matter which gave rise to the problem shows an apparent insensitivity by counsel to the valid concerns of the adverse client that confidences may be disclosed by the nonlawyer who had such a significant involvement on the other side of the case for over two years.[10]

---

8. The *actual* disclosure of a former client's confidence by a nonlawyer assistant would of course warrant disqualification of the new firm in any matter adverse to the client.

9. The St. Germaines argue that Smart waived its objection by raising this issue so late in the litigation. We note that Ms. Gregston began her new employment on October 18, less than two months before the scheduled trial date of Decem-

ber 7. The minute entry record of a pretrial conference indicates that Smart brought this matter to the attention of the trial court on October 25. We find no waiver on this record.

10. We can appreciate the practical problems of screening a secretary from access to or participation in one particular case in a sole practitioner's office. However, these concerns should have been addressed, possibly by requesting con-

Such conduct by counsel is insufficient to protect the "reputation of the bar as a whole." *Id.* at 259.

Under the facts of this case, we conclude that the trial court should have granted the motion to disqualify plaintiffs' counsel, and abused its discretion in failing to do so. No screening mechanism was utilized to assure Smart that its confidences were preserved, and, at this stage of the litigation, given Ms. Gregston's participation on behalf of the St. Germaines, we cannot fashion any remedial action that counsel could employ to mitigate Smart's perception that its confidences could be compromised, or to satisfy the duties imposed by ER 5.3.

### *Conclusion*

For the foregoing reasons, we hold that the trial court abused its discretion in denying Smart's motion to disqualify. We remand this matter to the trial court for entry of an order consistent with this opinion.[11]

The petitioner has requested attorneys' fees in this matter under the authority of Rule 25, Arizona Rules of Civil Appellate Procedure. There is no basis under that rule for awarding attorneys' fees in this matter. The request is denied.

NOYES and FIDEL, JJ., concur.

---

sent from the adverse client or by stipulating to Ms. Gregston's limited involvement as a typist, before she was hired. We cannot create more lenient ethical obligations based on the size of the law practice.

11. We suggest that the trial court consider that a means to alleviate any resulting hardship to plaintiffs might be to allow new counsel to have access to all work product and discovery obtained by plaintiffs' counsel before this conflict arose on October 18, 1993. In addition, the court may allow present counsel, under such conditions as are warranted, to consult with new counsel to explain the issues and current status of the case without Ms. Gregston's assistance. New counsel should also be furnished a copy of this opinion. *See Williams v. Trans World Airlines, Inc.,* 588 F.Supp. 1037, 1046 (W.D.Mo. 1984).