Paul STEEL, Plaintiff,

v.

## GENERAL MOTORS CORPORATION, Defendants.

Civil Action No. 95–2506.

United States District Court, D. New Jersey.

Dec. 5, 1995.

Thomas V. Convery, Sharon McConvery, Morley, Cramer, Tansey, Haggerty & Fanning, Woodbridge, New Jersey, for Petitioner General Motors Corporation.

James L. Griffith, Sr., Peter Garcia, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pennsylvania, for Respondents Kimmel & Silverman, P.C.

## OPINION

KUGLER, United States Magistrate Judge:

This matter comes before the court upon motion by Defendant General Motors Corporation to disqualify plaintiff's counsel, the firm of Kimmel & Silverman, due to that firm's recent hiring of Jay M. London, Esquire, former counsel for GM. The above-

captioned matter involves a single-vehicle breach of warranty action, commonly referred to as a "lemon law" case. In addition to the above-captioned matter, there currently are twenty (20) lemon law cases pending in the District of New Jersey against GM filed by Kimmel & Silverman, and this motion, by agreement of counsel, shall apply to all of them. These cases are:

| | | |
|---|---|---|
| Weisen v. GMC, | Civ. No. 95–2483 | (JHR) |
| Bove v. GMC, | Civ. No. 95–1453 | (JBS) |
| Abendroth v. GMC, | Civ. No. 95–1454 | (JHR) |
| Eisenberg v. GMC, | Civ. No. 95–2505 | (JHR) |
| Buckley v. GMC, | Civ. No. 95–2503 | (SSB) |
| Wohlforth v. GMC, | Civ. No. 95–1032 | (JBS) |
| Brophy v. GMC, | Civ. No. 95–500 | (MLP) |
| Worth v. GMC, | Civ. No. 95–499 | (AET) |
| Marazzo v. GMC, | Civ. No. 95–1476 | (AET) |
| Dilks v. GMC, | Civ. No. 95–1471 | (MLP) |
| Klosinski v. GMC, | Civ. No. 95–1829 | (AET) |
| Koheil v. GMC, | Civ. No. 95–2496 | (AET) |
| Lyszczak v. GMC, | Civ. No. 95–2497 | (GEB) |
| Ragolia v. GMC, | Civ. No. 95–1474 | (MLP) |
| Bodolosky v. GMC, | Civ. No. 95–998 | (GEB) |
| Bradin v. GMC, | Civ. No. 95–2975 | (JEI) |
| Cardona v. GMC, | Civ. No. 95–2936 | (WGB) |
| Kerns v. GMC, | Civ. No. 95–2970 | (JHR) |
| Sitko v. GMC, | Civ. No. 95–2973 | (JHR) |
| Mascio v. GMC, | Civ. No. 95–2976 | (SSB) |

Because of factual disputes contained in the parties' affidavits and moving papers, the court convened a hearing to inquire into the extent of Mr. London's involvement as GM counsel. Six witnesses testified: (1) Laurie Adams, GM Legal Assistant; (2) Paul Logue, GM Zone Manager; (3) Robert Silverman, Esquire, of Kimmel & Silverman; (4) Craig Kimmel, Esquire, of Kimmel & Silverman; (5) Jay London, Esquire, of Kimmel & Silverman; and (6) Ann Marie E. Musick, Mr. London's former secretary, and the parties submitted over twenty exhibits into the record.[1] Having considered the testimony and exhibits set forth at the hearing, along with the motion papers, briefs, and other submissions of the parties, the following constitute my findings of fact and conclusions of law.

*FINDINGS OF FACT*

1. Jay M. London, Esquire, is an attorney currently employed by the law firm of Kimmel & Silverman, P.C., in Bluebell, Pennsylvania. He is licensed in both Pennsylvania and New Jersey and has been practicing for approximately eight years. From August, 1988 through March, 1993, Mr. London

was employed as an associate at the Philadelphia law firm of George J. Lavin, Jr. and Associates, which subsequently became known as Lavin, Coleman, Finarelli & Gray (the "Lavin firm"). In March, 1993, he left the Lavin firm and joined the firm of Harvey, Pennington, Herting, & Rennelsen ("Harvey Pennington") as a litigation associate. In April, 1994, he left the Harvey Pennington firm and joined the firm of McBreen, McBreen & Kopko (the "McBreen firm"). (London, 9/13/95, at 88–89, 117.) Mr. London resigned from the McBreen firm on May 26, 1995 and joined the firm of Kimmel & Silverman on June 2, 1995. (London, 9/14/95, at 28, 56.)

2. Laurie Adams is employed by General Motors Corporation ("GM") as a legal assistant in Farmington Hills, Michigan. Her department is responsible for handling single vehicle breach of warranty cases, otherwise known as "lemon law" cases. She has been involved in lemon law cases since September, 1988, and her jurisdiction currently covers sixteen states, including New Jersey and Pennsylvania. Her responsibilities include supervising local counsel and managing lemon law cases on behalf of GM. Although Ms. Adams reports to a supervisor, she has the primary authority for selecting local counsel and making decisions regarding the progress of individual cases. (Adams, 8/17/95, at 4–9.)

3. The employees of GM's field offices, called "zone personnel," actively participate and cooperate with local counsel in the litigation of lemon law cases. These zone personnel are individuals with automotive technical background and experience, and, as part of their litigation duties, they review repair records, conduct inspections of allegedly defective vehicles, and provide their analysis and recommendations to GM and local counsel. (Adams, 8/17/95, at 18–19, 89–90.)

4. Kimmel & Silverman, P.C., is a law firm of five attorneys with offices in Bluebell, Pennsylvania and Haddonfield, New Jersey. Since 1991, the firm has engaged almost exclusively in lemon law matters. Robert Silverman, Esquire, and Craig Kimmel, Es-

---

1. As the hearing comprised five days of testimony on August 17, 1995, August 18, 1995, September 13, 1995, September 14, 1995, and September 15, 1995, all citations to the record will be distinguished by witness and date.

quire, are the firm's managing partners. (Silverman, 8/17/95, at 169–70.)

5. GM and Kimmel & Silverman have jointly created an early resolution program in which plaintiff's counsel and GM legal and technical personnel attempt to work out a particular claim prior to a lawsuit being instituted. If a matter cannot be settled, then it is referred to local counsel for litigation. Through this program, approximately half of all claims settle before suit is filed. (Silverman, 8/17/95, at 175–78.)

6. The Lavin firm was designated as local counsel for GM during the time that Mr. London was employed there. From March, 1990 through his departure from the Lavin firm in March, 1993, Mr. London was assigned to work on approximately 25–30 lemon law cases on behalf of GM, all in Pennsylvania. None of those cases involved Kimmel & Silverman as plaintiffs' counsel. (London, 9/13/95, at 92, 104, 106.)

7. Although none of the lemon law cases that Mr. London handled on behalf of GM went to trial, Mr. London had significant responsibilities with respect to the management of individual cases. He propounded and responded to interrogatories and other discovery requests, conducted depositions of plaintiffs, participated in vehicle inspections along with GM zone personnel, and discussed the technical aspects of a case with zone personnel. (London, 9/13/95, at 104, 106–07; 9/14/95, at 8, 87–88; Logue, 8/17/95, at 133.) He arbitrated one case, contacting Ms. Adams for her consent with respect to the arbitration strategy and tactics. (Adams, 8/17/95, at 24.)

He provided opinion letters to GM on individual cases which included his analysis of the facts, his legal opinion as to whether the facts of a particular case met the statutory requirements for a claim for damages, and his advice on what types of defenses should be raised and whether to settle or proceed to arbitration and/or trial. He also orally communicated this information to Ms. Adams on a regular basis. In addition, Ms. Adams discussed with Mr. London information that she had received from other local counsel regarding defense of GM lemon law cases.

(London, 9/13/95, at 107, 112; 9/14/95, at 88–89, 90–91; Adams, 8/17/95, at 19–21, 23.)

8. At the time that Mr. London joined the McBreen firm, that firm was not representing GM in any capacity. GM subsequently retained the McBreen firm as local counsel in the Philadelphia area after a meeting was held in August, 1994 at GM headquarters between GM legal staff, including Ms. Adams, and Mr. London and Steven Kantrowitz on behalf of the Philadelphia office of the McBreen firm. One topic of discussion at that meeting was GM's concern over the increasing number of cases being filed by Kimmel & Silverman in the Philadelphia area. (London, 9/13/95, at 117, 119–20; Adams, 8/17/95, at 25–27.)

9. While at the McBreen firm, Mr. London worked on approximately 25–30 GM lemon law cases in which the firm of Kimmel & Silverman represented the plaintiffs. On each particular GM lemon law case, he would initially receive an analysis and recommendation from a GM zone representative. He would then conduct a preliminary evaluation of a particular case, contact Mr. Silverman via telephone or in person to discuss the case, and, if necessary, contact the GM zone representative—usually Mr. Logue—to confirm GM's initial position and/or provide further information that Mr. London had received. He participated in a vehicle inspection on one occasion. He discussed settlement and evaluation of the cases with his supervisor, Steven Kantrowitz, and with Ms. Adams. At Ms. Adams' request, Mr. London coordinated his defense of Kimmel & Silverman's cases with the Lavin firm and attended joint defense committee meetings on behalf of GM in the Philadelphia area. (London, 9/14/95, at 5, 8, 10–11; 9/15/95, at 17; Adams, 8/17/95, at 38–39; Logue, 8/17/95, at 134–35.)

He designed and prepared case information statements which were analogous to the opinion letters he had prepared for GM while at the Lavin firm and which contained his analysis, comments, suggestions, and legal advice and opinions regarding each case. On the top of each of these statements was stamped "Attorney–Client Privilege." He acknowledges that these statements con-

tained privileged and confidential information. He often transmitted these statements to GM, and otherwise communicated with Ms. Adams, through GM's electronic mailing system, to which he was issued a user password. (London, 9/14/95, at 109–11; Adams, 8/17/95, at 30–33.)

10. At some point, GM, through Ms. Adams, provided the McBreen firm with standing settlement authority; Mr. London did not have to contact her to confirm settlement unless the claim for settlement exceeded a certain pre-authorized amount. Under this settlement authority, in many cases Mr. London would settle cases and explain the reasons why to Ms. Adams later. Mr. London acknowledges that the process by which this settlement authority is carried out is privileged and confidential information. The significance of this settlement authority is shown by the fact that of the approximately 50 firms in Ms. Adams' jurisdiction that have been retained as GM's local counsel, such standing settlement authority has only been provided to three. (Adams, 8/17/95, at 36–38; London, 9/14/95, at 130–31, 134.)

11. GM's "Guidelines for Handling Warranty and Lemon Law Litigation" are provided in confidence to all of GM's local counsel. Although Mr. London claims that he does not remember specifically if he ever received and reviewed a copy of these guidelines and procedures while at the Lavin or McBreen firms, he does recognize the cover page, and he does remember a "several page document" which he identified as "single vehicle breach of warranty guidelines for local counsel" provided by GM. These guidelines also were discussed during the August, 1994 meeting in Detroit between Ms. Adams and members of the McBreen firm where copies were distributed. Mr. London does not believe that these guidelines contain any information about handling lemon law cases that is not otherwise publicly available, except for internal information about the divisions and organization of GM. He also received infor-

mation about preparing pleadings in a GM lemon law case and sample evaluation letters that were to be submitted to GM. (London, 9/13/95, at 100–01; 9/14/95, at 9–10, 96, 98–99, 106; Adams, 8/17/95, at 9–10, 28.)

12. Mr. London became dissatisfied with his employment at the McBreen firm, and he resigned on Friday, May 26, 1995. He testified that in order to protect GM's interests, and with the consent of Mr. Kantrowitz, he felt he should contact plaintiff's counsel, Mr. Silverman, to ask for extensions of time in which to file three answers which were due the week of May 29, 1995. That weekend being the Memorial Day holiday, Mr. London telephoned Mr. Silverman at his beach house on Monday, May 29, 1995, ostensibly to ask for these extensions and to notify plaintiff's counsel of his resignation. (London, 9/14/95, at 12–34.)

During that telephone call, Mr. Silverman asked Mr. London if he would be interested in coming to work for Kimmel & Silverman. According to Mr. Silverman, the firm needed an experienced litigator to help with the workload of cases against manufacturers other than GM. Mr. Silverman testified that he extended this proposal because he knew Mr. London to be a hardworking attorney from his dealings with him at the McBreen firm.[2] (Silverman, 8/17/95, at 183–86.)

13. As a result of this inquiry, Mr. London conducted some research into his ethical obligations. He consulted the Pennsylvania Rules of Professional Conduct, researched Pennsylvania cases, and contacted a lawyer on the Philadelphia Bar Association Professional Guidance Committee, who told him that Pennsylvania recognizes the use of ethics screens—or "Chinese walls"—in situations where lawyers effectively "switch sides." He did no research under New Jersey law. Mr. London concluded that he would not violate his ethical obligations to GM as long as there was a proper ethics screen in place at Kimmel & Silverman to

---

**2.** While Mr. London was at the Lavin firm, Mr. Silverman "didn't know [he] existed." (Silverman, 8/17/95, at 171.) Neither did he have occasion to observe Mr. London in any arbitration.

He did not conduct a reference check or any other type of background investigation before hiring Mr. London. (Silverman, 8/17/95, at 171; 8/18/95, at 16, 62–63.)

prevent the disclosure of GM confidences.[3] (London, 9/14/95, at 37–40.)

14. On Wednesday, May 31, 1995, Mr. London went to the offices of Kimmel & Silverman to discuss the employment proposal. Earlier that morning, he and his wife had prepared a document that contained the parameters of an ethics screen to be implemented at Kimmel & Silverman. When he arrived at Kimmel & Silverman, he sat down with Mr. Kimmel and discussed the ethics screen and how it would work. Mr. Silverman testified that 99% of the discussion that day centered around the implementation of the ethics screen. The final document containing the operation of the screen was distributed to all of Kimmel & Silverman's employees for endorsement. It is undisputed that no inquiry was made into New Jersey ethics rules. (Kimmel, 8/18/95, at 75, 113; Silverman, 8/17/95, at 186–88; London, 9/14/95, at 43–46.)

The record indicates that Mr. London left the offices of Kimmel & Silverman that afternoon with an offer of employment. Although Mr. London had equal or less legal experience than the other two associates who then had been working at Kimmel & Silverman for over one year, he was offered a substantially higher salary and a more prestigious placement of his name on the firm's letterhead.[4] Mr. Silverman testified that the reason for this was his belief that Mr. London would work harder and longer than the other associates. (Silverman, 8/17/95, at 204–06, 209–10.)

15. On the morning of June 2, 1995, Mr. London called Ms. Adams at her home and notified her that he had resigned from the McBreen firm and was considering joining Kimmel & Silverman. He attempted to assure her that the interests of GM would be fully protected. Later that day, he sent a disclosure letter to GM via certified mail and faxed a copy to Ms. Adams on June 7, 1995, to which GM did not give its consent or otherwise reply. (London, 9/14/95, at 57, 60–61, 64–65.)

16. Mr. London reported for work on Wednesday, June 7, 1995 under the supervision of Mr. Kimmel who, along with Mr. London, would work on all lemon law cases that did not involve GM. Mr. Silverman would work on all GM cases, and the ethics screen would purportedly prevent from Mr. London or Mr. Kimmel—as the managing partner with GM clients—from having any intentional or inadvertent contact with GM cases.

Since Mr. London has joined Kimmel & Silverman, he has represented plaintiffs in approximately one hundred lemon law cases against auto manufacturers other than GM. The cases that are the subject of this motion were brought by Mr. Silverman or Michael Power, Esquire, a Kimmel & Silverman associate. (London, 9/14/95, at 77; Kimmel, 8/18/95, at 78; Silverman, 8/17/95, at 183, 214.)

17. The office space of Kimmel & Silverman at Blue Bell, Pennsylvania houses all of the clients' files. The firm leases approximately 10,000 square feet of office space which includes fourteen separate offices and two conference rooms. Each attorney's office locks by a separate key. There are three entrances to the space, each locking with a master key possessed by Mr. Silverman only. (Kimmel, 8/18/95, at 83.)

As a result of Mr. London joining the firm, Mr. Silverman spent a "significant amount of money" to knock down a wall in his office to create a "sub-office" where all the GM files are housed. The only access to this room is through Mr. Silverman's office. Each GM file is labelled and marked with blue electrical tape on the front for easy identification. There is a sign-out log for anyone removing a GM file. Neither Mr. London nor Mr. Kimmel is allowed in this sub-office or in any other room containing a file marked with the blue GM tape. (Silverman, 8/17/95, at 189.)

---

**3.** Mr. London testified that even absent an ethics screen, he believes that he is not ethically prohibited from representing plaintiffs against GM in lemon law cases. (London, 9/14/95, at 69–70.) *See also* Testimony of Craig Kimmel, 9/13/95, at 6.

**4.** Although Mr. London's current salary is significantly higher than what he received at McBreen, his current salary includes no benefits, no profit-sharing, and no expense account. (Kimmel, 8/18/95, at 91–92; Silverman, 8/17/95, at 208, 211–12; London, 9/14/95, at 47–48.)

The offices of Mr. Kimmel, Mr. London, and Mr. Silverman are all in separate corners of the office space. Mr. London's office is located approximately forty feet from Mr. Silverman's office, with four offices and several secretary carrels in between. All files which Mr. London handles are kept in his office, and Mr. London does not have a key to anyone's office other than his own. Every attorney in the firm has his or her own computer, but they are not on a network. Mr. London has a secretary assigned to him alone. (Silverman, 8/17/95, at 190–91; Kimmel, 8/18/95, at 90; London, 9/14/95, at 80–81.)

All telephone calls to Mr. London are received first by a receptionist and then by Mr. London's secretary who verify that the call does not involve GM matters. When Mr. Kimmel, Mr. Silverman, and the office manager leave the building, all telephone calls are forwarded to an answering service. Mr. Silverman also receives and reviews all incoming mail before Mr. London sees it. (Silverman, 8/17/95, at 192–95; London, 9/14/95, at 79–80.)

18. Although the operation of this ethics screen seems straightforward, there are inconsistencies in the witness' testimony with respect to certain incidents which lead this court to conclude that the operation may not always run so smoothly and that the contours of the screen may not be so clear. Mr. Silverman testified that under the ethics screen, he receives all incoming faxes. If he is away for a short period of time during the day, all incoming faxes are placed on his chair to await his return. Under no circumstances are Mr. Kimmel or Mr. London to see any faxed correspondence before Mr. Silverman has had a chance to review it. When asked what happens to the faxes when he goes on vacation, Mr. Silverman responded that there had not been occasion to address that situation as he had not taken a vacation from the time the ethics screen was implemented to the time of the hearing. (Silverman, 8/17/95, at 195, 210–11.)

Despite this recitation of the fax procedure in place under the ethics screen, the court was presented with a document dated July 11, 1995 which Mr. Kimmel signed on behalf of a plaintiff in a lemon law case. The document accepted a settlement offer in a pre-suit case against GM. (Def.Ex. 3.) When asked how it could have happened that Mr. Kimmel signed his name on a GM matter, Mr. Kimmel responded that it was included in a packet of documents that he had received via telefax, not from GM, but from the Better Business Bureau, that a quick response was required, and that Mr. Silverman was on trial. Mr. Kimmel testified that he neither looked at the file nor consulted with the client. (Kimmel, 8/18/95, at 79–87.)

When Mr. Silverman was asked whether this constituted a violation of the ethics screen, he responded that the letter should not have been written, that it was a violation of the firm's policy, and that if it had been done by one of the firm's employees, that employee would be reprimanded and subject to termination for a second violation. (Silverman, 8/17/95, at 223, 225.) He testified:

> There is no excuse for this. He should not have written this letter. I could look into it to see why he wrote the letter but that still wouldn't give an excuse. He shouldn't have written the letter, and he will be talked to.

(Silverman, 8/17/95, at 226.)

During the next day's testimony, however, Mr. Silverman's position changed:

> If I testified that there was a breaching of the wall, I mis-spoke. There was in my opinion a violation of our firm administrative policy with regard to the segregation of cases. But at no time has there ever been a violation of or a breach of the actual screening procedures or of the wall.

(Silverman, 8/18/95, at 21.) According to Mr. Silverman's clarified testimony, the assignment of GM files to Mr. Silverman and non-GM files to Mr. Kimmel is an administrative decision only and is not a component of the ethics screen, despite its incorporation into the screening document prepared by Mr. Kimmel and Mr. London. (Silverman, 8/18/95, at 21; Resp. Br. Ex. G.)

Further questions by the court prompted the following dialogue:

> THE COURT: Excuse me, I'm sorry, are you saying you, today, you don't think

there is anything wrong with Mr. Kimmel having sent that letter of July 11th which is Exhibit D–3, is that your testimony?

THE WITNESS: My testimony yesterday—after I looked into it and looked at the file, I think he had to do that to protect [the client's] interest. The offer would lapse, and I was on trial.

THE COURT: The question I had, did you think it was wrong for him to have sent that letter marked Exhibit D–3?

THE WITNESS: I believe that it was— he had to do it, but I wish he hadn't.

THE COURT: Was it wrong or not?

THE WITNESS: No, Sir.

THE COURT: You agree yesterday you testified that it was wrong. It was a violation of policy, didn't you?

THE WITNESS: It was a violation of our policy.

THE COURT: It shouldn't have been done. That's what you testified to yesterday?

THE WITNESS: Yes, Your Honor.

(Silverman, 8/18/95, at 52–53.)

In addition, the court asked Mr. Silverman whether it would be a violation of the ethics screen if Mr. Kimmel had looked at the case file when he signed the July 11, 1995 letter. Mr. Silverman responded that it would not; in contrast, Mr. Kimmel testified that it would violate the ethics screen. (Silverman, 8/18/95, at 61; Kimmel, 8/18/95, at 83.)

There also were several instances of Mr. Kimmel signing recent letters of representation on GM cases. (*See* Def.Ex. 5, 7–8.) Neither Mr. Silverman nor Mr. Kimmel believes this to be a violation of the ethics screen. (Silverman, 8/18/95, at 58; Kimmel, 8/18/95, at 88–89; 9/13/95, at 45–46.)

19. There is no accounting system set up at Kimmel & Silverman that prevents Mr. London from receiving any part of his salary from revenues generated in GM cases. All revenues received by Kimmel & Silverman from all sources are deposited in a general fund from which salaries of all the Kimmel &

Silverman employees are drawn. Mr. London would be precluded, however, from sharing in any proceeds that may be received from GM over and above the usual fee. (Kimmel, 9/13/95, at 27–33.)

*CONCLUSIONS OF LAW*

### I. NEW JERSEY LAW GOVERNS

Under the local rules of this court, the American Bar Association's Model Rules of Professional Conduct ("RPC"), as modified and adopted by the New Jersey Supreme Court, govern this dispute. Rule 6A, General Rules of the United States District Court for the District of New Jersey. This rule, amended in 1989, "makes it clear that the ethical rules and constraints imposed on federal practitioners in New Jersey are the same as those imposed on New Jersey attorneys generally by the state Supreme Court under New Jersey Court Rule 1:14." Allyn Z. Lite, *New Jersey Federal Practice Rules* 34 (1995 ed.). *See Alexander v. Primerica Holdings, Inc.*, 822 F.Supp. 1099, 1113–14 (D.N.J.1993); *Kaselaan & D'Angelo Associates, Inc. v. D'Angelo*, 144 F.R.D. 235, 243 (D.N.J.1992); *Bagdan v. Beck*, 140 F.R.D. 650 (D.N.J.1991).

This court must look to the New Jersey state courts' interpretation of the RPC as primary authority guiding its determination, subject to such modifications as federal law may require or permit. "Save for such peculiarly federal modifications, however, the Court's intent—clarified by the 1989 changes—is to track the parallel state provisions." Allyn Z. Lite, *New Jersey Federal Practice Rules* 34 (1995 ed.). Where there is no definitive state court decision interpreting the RPC, a federal court may reach its own conclusion as to the appropriate application. *Id.* This court notes, however, that it must take great care, when considering authority from other states and other federal courts within the Third Circuit, not to stray from New Jersey's policy of ensuring strict compliance with its RPC.[5] *See Reardon v. Marlayne, Inc.*, 83 N.J. 460,

5. The court is aware that an identical motion has just been decided by the Honorable Edward N. Cahn, U.S.D.J., in the Eastern District of Pennsylvania. To the extent Judge Cahn reaches different conclusions, it is noted that he decided that motion under the law of Pennsylvania which differs from New Jersey ethics law in several respects.

416 A.2d 852 (1980); *Dewey v. R.J. Reynolds Tobacco Company,* 109 N.J. 201, 536 A.2d 243 (1988); *In Re Advisory Opinion on Professional Ethics No. 569,* 103 N.J. 325, 329–30, n. 4, 511 A.2d 119, 121–22, n. 4 (1986).

■ Under this policy, "[i]f there is any doubt as to the propriety of an attorney's representation of a client, such doubt must be resolved in favor of disqualification." *Reardon,* 83 N.J. at 471, 416 A.2d at 858.

■ Resolution of a motion to disqualify requires the court to balance "the need to maintain the highest standards of the [legal] profession" against "a client's right to freely choose his counsel." *Dewey v. R.J. Reynolds Tobacco Co.,* 109 N.J. 201, 205, 536 A.2d 243, 245 (1988) (quoting *Government of India v. Cook Indus., Inc.,* 569 F.2d 737, 739 (2d Cir.1978)). This balancing involves a "painstaking analysis of the facts and precise application of precedent." *Reardon v. Marlayne, Inc.,* 83 N.J. 460, 469, 416 A.2d 852, 857 (1980); *Dewey,* 109 N.J. at 205, 536 A.2d at 244–45.

■ GM, as the petitioner, bears the burden of proving that disqualification is appropriate. *Dewey,* 109 N.J. at 221–22, 536 A.2d at 253; *Kaselaan & D'Angelo Associates, Inc. v. D'Angelo,* 144 F.R.D. 235, 238 (D.N.J. 1992). GM claims that RPC 1.10 mandates disqualification of an entire firm when a lawyer associated with that firm would be disqualified under RPC 1.9. GM advances three reasons under RPC 1.9 why Mr. London would be disqualified from the cases that are the subject of this motion, resulting in the imputed disqualification of Kimmel & Silverman. First, GM contends that Mr. London would be disqualified from these matters under RPC 1.9(a)(1) because they are "substantially related" to matters in which Mr. London represented GM during his employ with the Lavin and McBreen firms. Second, GM contends that Mr. London would be disqualified under RPC 1.9(a)(2) because he obtained information while representing GM which is not generally known and which could be used to GM's detriment. Third, GM contends that Mr. London's employment with Kimmel & Silverman creates an "appearance of impropriety" under RPC 1.9(b) and 1.7(c).

The relevant rules provide:

**RPC 1.9 Conflict of Interest: Former Client**

(a) A lawyer who has represented a client in a matter shall not thereafter:

(1) represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation with the former client; or

(2) use information relating to the representation to the disadvantage of the former client except as RPC 1.6 would permit with respect to a client or when the information has become generally known.

(b) The provisions of RPC 1.7(c) are applicable as well to situations covered by this rule.

**RPC 1.10 Imputed Disqualification: General Rule**

(a) When lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by RPC 1.7, RPC 1.8, RPC 1.9 or RPC 2.2.

(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by RPC 1.6 and RPC 1.9(a)(2) that is material to the matter.

. . . . .

(e) A disqualification prescribed by this rule may be waived by the affected client under the conditions stated in RPC 1.7 except where prohibited by law or regulation, such as the prohibition against a public entity waiving an attorney conflict of interest.

It is undisputed that Mr. London formerly represented GM within an attorney-client relationship and that GM has not consented to or waived a potential conflict of interest. Analysis of the current motion is therefore confined to: (1) whether any of the cases now being handled by Kimmel & Silverman against GM are matters which are "the same" or "substantially related" to matters previously handled by Mr. London while he was employed at the Lavin and McBreen firms, RPC 1.9(a)(1); (2) whether Kimmel & Silverman is using "information relating to the representation" which was obtained by Mr. London while he was employed at the Lavin and McBreen firms to the disadvantage of GM and which is not generally known, RPC 1.9(a)(2); and (3) whether, in the absence of an actual conflict, an "appearance of impropriety" exists sufficient to warrant disqualification. If any of these three situations exists, the court must determine whether the ethics screen currently operating at Kimmel & Silverman prevents the imputed disqualification of the entire firm.

## II. *DISQUALIFICATION OF JAY LONDON*

### A. *RPC 1.9(a)(1)—"Same or Substantially Related Matter"*

■ Kimmel & Silverman currently have no cases pending on which Mr. London represented GM while he was employed at the Lavin or McBreen firms; all of the cases in that category were referred away to outside counsel when Mr. London joined Kimmel & Silverman. (Silverman, 8/17/95, at 197–98; Adams, 8/17/95, at 100–02.)

Kimmel & Silverman argue that neither are any of the present cases "substantially related" to the cases London worked on as GM counsel because they are factually distinct from one another. They rely upon *Opinion 654* of the New Jersey Advisory Committee on Professional Ethics ("Advisory Committee") for support.[6] 129 N.J.L.J. 514 (1991). *Opinion 654* found a shift in the "substantial relation" test from the period

prior to the 1984 adoption of the RPC when the New Jersey Supreme Court's formulation was a "substantial relationship between the subject matter of the present suit and that of cases worked on during the former representation," *see Reardon v. Marlayne, Inc.,* 83 N.J. 460, 416 A.2d 852 (1980), to the language of the current rule—"the same or a substantially related matter." RPC 1.9(a)(1). The Advisory Committee considered this shift to be significant, suggesting that under the current rule "the matters themselves—the cases—must be substantially related." *Opinion 654,* 129 N.J.L.J. at 514. Thus, where the old test found a substantial relationship even if the specific facts or cases were distinct as long as there was some other significant nexus, the new, narrower test "contemplates a factual nexus between the cases." *Id.*

GM conceded that although the legal theories and defenses in all the lemon law cases are virtually identical, the facts giving rise to each lawsuit vary according to the mechanical problems associated with each vehicle. (Adams, 8/17/95, at 80–83; Logue, 8/17/95, at 150.) According to the testimony of Ms. Adams and Mr. Logue, there is no actual or logical connection between the mechanical problems of one vehicle and those of another, and the settlement amounts for each vehicle vary with the facts of each case. (Adams, 8/17/95, at 83–84, 123.) Therefore, Respondents argue, under the reasoning of *Opinion 654,* there is no basis to find that the current cases are "substantially related" to those in which Mr. London represented GM.

GM claims that a factual nexus among cases that are alleged to be "substantially related" is not necessary, arguing that the test to be applied is whether "adversity between the interests of the attorney's former and present clients has created a climate for the disclosure of relevant confidential information." *Kaselaan & D'Angelo,* 144 F.R.D. at 238 (quoting *Reardon v. Marlayne,* 83 N.J. at 472, 416 A.2d at 858–59). It is under this formulation that GM asks the court to

**6.** The New Jersey Supreme Court appoints fifteen lawyers and three lay members to serve on the Advisory Committee on Professional Ethics. N.J.R. 1:19–1. Unless reviewed and acted upon

by the New Jersey Supreme Court, the opinions of the Advisory Committee are binding only upon the Committee. N.J.R. 1:19–6.

conclude that the current cases are substantially related to the cases that Mr. London worked on as GM counsel.

New Jersey courts, both prior and subsequent to the 1984 adoption of the RPC, have produced no bright-line rule for an application of a "substantial relationship" test, but rather have considered varying facts and circumstances in arriving at such a determination. Given the thoughtful discussions by New Jersey courts on what constitutes a substantial relationship, a brightline test which finds a substantial relationship only when there is a "factual nexus" between cases appears to be an overly narrow interpretation of New Jersey precedent. In *In re Advisory Opinion on Professional Ethics No. 621*, 128 N.J. 577, 602, 608 A.2d 880, 892 (1992), the New Jersey Supreme Court advised against such bright-line applications:

> Whether per se rules or standards to be applied on a case-by-case basis are used in connection with the enforcement of the RPCs and with the ethics principles and applications flowing from our cases depends on the nature of the problem, the nature of the rule, and our own good judgment. We assume that bright line per se rules will be found more often in cases affecting public employment and public employees than in those cases limited strictly to private practice.
>
> . . . . .
>
> Given the record before us, and given our impression as to the potential varieties of the relationships, we are influenced by the countervailing considerations that argue against the per se prohibition embedded in the [Advisory Committee's] opinion.

*Id.* at 602, 608 A.2d at 892.

The opinion of the New Jersey Supreme Court in *Reardon v. Marlayne, supra,* provides the seminal discussion of a "substantial relationship" in this context. In *Reardon,* defendant General Motors sought to prevent the plaintiff's attorney from representing the plaintiff in a products liability action alleging brake failure on the grounds that he had formerly represented General Motors in similar suits. As *Reardon* was decided prior to the adoption of the RPC, the court analyzed the situation under the relevant controlling ethical standard at that time, Disciplinary Rule ("DR") 4–101, entitled "Preservation of Confidences and Secrets of a Client," and held that one prong of a three-part test for disqualification of a lawyer who brings an action against a former client was whether "a substantial relationship or a reasonable perception, from the public's perspective, of a substantial relationship" exists "between the subject matter of the present suit and that of cases worked on during the former representation." *Id.* at 474, 416 A.2d at 859–60. Under this prong, "a substantial relationship between matters will exist where the adversity between the interests of the attorney's former and present clients has created a climate for disclosure of relevant confidential information." *Id.* at 472, 416 A.2d at 859. Disqualification is mandated where "the issues between the former and present suits are practically the same or where there is a 'patently clear' relationship between them." *Id.*

Respondents seek to minimize the importance of the *Reardon* court's discussion of a "substantial relationship" by referring to the New Jersey Supreme Court's later opinion in *Dewey, supra,* in which the court held that the three-part test enunciated in *Reardon* no longer controlled disqualification motions that were brought under the newly-adopted RPC. *Dewey,* 109 N.J. at 212, 536 A.2d at 248. It is upon this point that the Advisory Committee relied in *Opinion 654* when it held that the language of the new RPC 1.9(a)(1)—"the same or substantially related matter"—completely replaced the reasoning of the *Reardon* court with respect to what constitutes a "substantial relationship." This simplistic application of *Dewey* overlooks the *Dewey* court's significant reliance upon *Reardon* for various points later in its opinion, despite its holding that the *Reardon* three-part test no longer controlled.[7] The *Dewey*

---

7. The *Dewey* court cited *Reardon* numerous times for support of its reasoning, including: (1) its emphasis of the fundamental importance of a lawyer's obligation to preserve a client's confidences, 109 N.J. at 217, 536 A.2d at 251; (2) its recognition that an individual's right to choose counsel of his or her own choosing may be limited by a lawyer's ethical obligations, *id.* at

court did not hold that *Reardon* was bad law; rather, it held that disqualification motions based on current representation of clients with interests adverse to those of a former client were now to be analyzed under the language of RPC 1.9, as opposed to the three prongs set forth by *Reardon.* This does not mean that the reasoning of *Reardon* does not also support the language of the rule. In fact, the *Dewey* court recognized that much of the discussion in *Reardon* was consistent with the language of the new rules.[8] And, since the *Dewey* court did not address the point of what test should be used to determine what is a "substantially related matter," this court is left to conclude that the reasoning of *Reardon* on this issue survives, if not as black-letter law, then at least for guidance on the factors that this court should consider in a determination of what is a "substantially related matter."

The court in *Kaselaan & D'Angelo Associates, Inc. v. D'Angelo,* 144 F.R.D. 235 (D.N.J.1992), construing New Jersey law, came to the same conclusion. The court in *Kaselaan* recognized that there was no definitive test to be applied in New Jersey for what constitutes a "substantial relationship" and found that *Reardon* provided the strongest authority. In response to the respondents' argument that a "substantial relationship" requires factual identity, accompanied by citations to federal cases in New Jersey and other jurisdictions which had so held,[9] the *Kaselaan* court stated:

218, 536 A.2d at 251; (3) its adherence to the view that ethical standards must not bend to the changing demands of the job market, *id.* at 220–21, 536 A.2d at 253; (4) its holding that the former client has the burden of proof on such disqualification motions, *id.* at 221–22, 536 A.2d at 253; and (5) its admonition that inquiry into a lawyer's actual acquisition of confidential information should only be resorted to as a last resort, *id.* at 222–23, 536 A.2d at 254. The *Dewey* court also cited *Reardon* as an example where a different factual record would compel a different analysis and a different result, although not necessarily an incorrect one. *Id.* at 220, 536 A.2d at 252.

**8.** For example, the *Dewey* court recognized that under RPC 1.9, an initial determination must be made as to whether the lawyer "represented" the former client. If so, then the lawyer would be prohibited from representing a different client with adverse interests in the same matter. "This prohibition is consistent with that reached under

As is evident, the meaning of "substantially related" under RPC 1.9(a)(1) is broadly construed in New Jersey.

. . . . .

In the absence of a supervening federal statutory or decisional law interest, a disqualification standard that equates "substantially related" to "factually identical" ... is unnecessarily restrictive when compared to the plain language of RPC 1.9(a)(1) and New Jersey authorities.

*Id.* at 243. The *Kaselaan* court recognized that while courts from other jurisdictions interpret the term "substantially related" narrowly, *see Kaminski Brothers, Inc. v. Detroit Diesel Allison,* 638 F.Supp. 414, 416–17 (M.D.Pa.1985), New Jersey courts make it clear that New Jersey has taken the opposite view. *Id. See In Re County of Bergen,* 268 N.J.Super. 403, 408, 633 A.2d 1017, 1020 (App.Div.1993) ("Our Rules of Professional Conduct are stringently enforced, and would even appear to be stricter than those of other states."). The *Kaselaan* court found that under the standard enunciated by the New Jersey Supreme Court in *Reardon,* and as adopted in RPC 1.9(a)(1), a substantial relationship exists where the adversity between the interests of the former and current clients creates a climate for the disclosure of relevant confidential information and where the issues between the former and present

our case law prior to the adoption of the RPCs. *See Reardon v. Marlayne, Inc., supra,* 83 N.J. at 470, 416 A.2d 852, and the authorities cited therein." *Dewey,* 109 N.J. at 212–13, 536 A.2d at 248–49.

The *Dewey* court also noted that the application of RPC 1.10 would disqualify a lawyer's entire firm if that lawyer was disqualified under RPC 1.9, a result "entirely consistent" with the result reached by the *Reardon* court and other pre-adoption cases. *Id.* at 217, 536 A.2d at 251.

**9.** *See Ciba–Geigy v. Alza Corp.,* 795 F.Supp. 711 (D.N.J.1992); *Richards v. Badaracco,* No. 88–836, 1988 WL 147152 (D.N.J.1988); *Satellite Financial Planning v. First National Bank,* 652 F.Supp. 1281 (D.Del.1987); *Kaminski Brothers, Inc. v. Detroit Diesel Allison,* 638 F.Supp. 414 (M.D.Pa.1985); *United States Football League v. Nat'l Football League,* 605 F.Supp. 1448 (S.D.N.Y.1985).

matters are practically the same. *Kaselaan & D'Angelo,* 144 F.R.D. at 243–44.

Because the reasoning of *Reardon* was endorsed by the New Jersey Supreme Court in *Dewey* and by New Jersey appellate courts, both prior and subsequent to the adoption of the RPC,[10] this court finds that application of *Opinion 654* in the instant case would be contrary to the weight of the controlling precedent and would disserve the interpretation by the New Jersey courts of a "substantial relationship." To the extent that federal courts in the Third Circuit and other jurisdictions have departed from the *Reardon* formulation, they do not govern.

It is evident from the record that while Mr. London was employed at the Lavin and McBreen firms, he was in a position to obtain information from GM regarding its legal policies and strategies, approaches to settlement, and bargaining positions with respect to individual cases. He formed a close professional relationship with Laurie Adams and dealt with her on lemon law matters over a number of years. He met with Ms. Adams and other GM legal personnel at GM headquarters, and he received a password to log into GM's electronic mail system. He had primary authority to handle most of his lemon law cases and was the primary contact for Ms. Adams. Notwithstanding Mr. London's account that he did not receive a copy of GM's guidelines for handling lemon law cases, and that even if he did there was no confidential information contained therein, the mere fact that he had access to confidential information is enough for this court to presume that he in fact learned of such confidential claims handling and settlement information. *Gray v. Commercial Union Insur.*

*Co.,* 191 N.J.Super. 590, 598, 468 A.2d 721, 726 (App.Div.1983).[11] He actively participated in the settlement of lemon law cases on behalf of GM, and he learned enough about GM's litigation and settlement strategies to author opinion letters to Ms. Adams in which he analyzed the factual and legal issues of each case and recommended a certain course of action.

He is now employed by a firm who represents plaintiffs with interests that are directly adverse to those of GM. It is undisputed that the legal issues in the lemon law cases handled by Mr. London on behalf of GM and those now being handled by Kimmel & Silverman against GM are virtually identical, the only differences being the mechanical defects and the purchase and repair history associated with each particular vehicle. While it is true that these facts vary with each case, it is also apparent that the universe of automotive mechanical problems is not endless, and it is likely that in litigating dozens of lemon law cases involving one manufacturer, a lawyer encounters many alleged mechanical defects of the same kind. It is illogical to suggest that each new lemon law case is a creature of a different stripe, presenting unfamiliar circumstances to an experienced lemon law attorney. In light of all these relevant factors, the court rejects the respondents' argument that there is no substantial relationship among these lemon law cases. Although the court has no reason to believe that Mr. London would intentionally disclose any relevant confidential information he possesses regarding GM's handling of lemon law cases, actual disclosure is not the test for a substantial relationship. The adversity between the interests of GM and those of the plaintiffs currently being repre-

**10.** See *Gray v. Commercial Union Insur. Co.,* 191 N.J.Super. 590, 468 A.2d 721 (App.Div.1983); *In Re County of Bergen,* 268 N.J.Super. 403, 633 A.2d 1017 (App.Div.1993).

**11.** Respondents argue that the court improperly received into evidence at the hearing a binder containing documents which the court determined to be protected by the attorney-client privilege. (Def.Ex. 1.) Although the court allowed respondents' counsel to examine the documents for a short time at the hearing, they argue that they are prejudiced by not being able to cross-examine witnesses on these documents and that the privilege was waived by virtue of GM placing

these documents into the record. They maintain that because GM is using the documents as "both a sword and a shield," GM's burden of proof should be raised beyond the ordinary motion to disqualify. It is not necessary to address respondents' argument, inasmuch as a showing of actual confidences is not required under *Gray.* The court has not considered the content of the submitted documents in its decision; rather, the court relied upon the testimony of Ms. Adams, Mr. Logue, and Mr. London in concluding that Mr. London had access to confidential information.

sented by Kimmel & Silverman has created a climate whereby relevant confidential information may be disclosed in the interests of effective representation of the plaintiffs.

B. *RPC 1.9(a)(2)—Use of Information to the Disadvantage of the Former Client That is Not "Generally Known"*

▉ The court further holds that Mr. London would be disqualified under RPC 1.9(a)(2). Where a substantial relationship exists, the court will assume that confidential information has passed between an attorney and a former client, notwithstanding the attorney's declarations to the contrary. *Reardon v. Marlayne,* 83 N.J. at 473, 416 A.2d at 859. This presumption of access to and knowledge of confidences may not be rebutted. *Id.*

▉ Moreover, Rule 1.9(a)(2) does not limit its protection to confidential information. *G.F. Industries v. American Brands, Inc.,* 245 N.J.Super. 8, 14, 583 A.2d 765, 768 (App. Div.1990). The factual record discussed herein reveals that Mr. London possesses "information relating to the representation" of GM, and the direct adversity between the plaintiffs and GM, along with the legal and factual similarity of the cases, indicate that if Mr. London were to represent the plaintiffs, his ethical obligation to fully protect their interests would necessarily require him to use that information to the advantage of the plaintiffs and to the disadvantage of GM.[12] The New Jersey cases which have found violations of RPC 1.9(1)(2) have done so on the basis that both a substantial relationship existed between the successive representations, and the lawyer had represented the former client over a number of years, two facts which are also present in the instant matter. *See Reardon v. Marlayne, supra; G.F. Industries, Inc. v. American Brands, Inc., supra.*

The only question becomes whether the information in Mr. London's possession is "generally known." Respondents argue that the information that Mr. London received or learned was public information, was his own solid understanding of the lemon laws and their application in the course of litigation which no client can ever own, and was already known by Mr. Silverman long before Mr. London was employed by Kimmel & Silverman.

Mr. London stated that he found information regarding GM's approach to lemon law cases in a 1986 article published by the Pennsylvania Bar Association and distributed to members of the bar association at a conference, and also found in the public law library. (London, 9/13/95, at 96–97.) Members of the Lavin firm, the only firm in Philadelphia other than the McBreen firm to represent GM in lemon law cases, spoke at legal conference regarding how to defend a lemon law case. (London, 9/15/95, at 23–24.) Mr. London also stated that much of the information he possessed about the handling of lemon law cases came from his own research, his trial advocacy classes in law school, and his general experience at the Lavin firm with respect to cost-effective handling of cases. (London, 9/13/95, at 92, 108–09.) According to Mr. London, most of the information one needs to handle a lemon law case can be found in legal encyclopedias and law review articles, including checklists for proving the elements of a claim or defending a claim, what documents must be reviewed, how to calculate damages, and model interrogatories, deposition questions, and cross-examination questions of experts. (London, 9/13/95, at 98–100.)

Mr. Silverman stated that GM has no pleading strategy—all of its answers are identical—and that its discovery strategy is "crystal clear." (Silverman, 8/17/95, at 174–75.) As for GM's settlement strategy, Mr. Silverman testified that by virtue of dealing extensively with GM zone personnel and local counsel on hundreds of cases, particularly

---

12. The court notes that in the opinion of the ethics expert hired by Kimmel & Silverman for purposes of this motion, David H. Dugan, III, Esquire, Mr. London would be disqualified under RPC 1.9(a)(2). According to Mr. Dugan, Mr. London learned of GM's guidelines and procedures relating to the litigation of lemon law

cases, and he gained insights into the personality characteristics of Ms. Adams as the primary decision-maker for GM. If he were to represent the plaintiffs, his ethical obligations to them would require that he "use" that information to the detriment of GM.

through the early resolution program, he knew exactly how GM went through its settlement process, including what documentation GM required and how local counsel would correspond with Ms. Adams. (Silverman, 8/17/95, at 178–82.) When asked what GM's settlement strategy is, Mr. Silverman responded that GM's "philosophy is to collect the information on these fact-sensitive cases and settle them as cheaply as possible and avoid legal fees." (Silverman, 8/17/95, at 179.) According to Mr. Silverman and Mr. London, the work necessary to litigate a lemon law case, whether on the plaintiff or the defense side, is strictly *pro forma* and involves no legal analysis or strategy; it merely requires a collection of all the relevant facts and documents, completion of form pleadings and discovery responses, and a few telephone calls between plaintiff's and defense counsel. (London, 9/15/95, at 19–21; 42–44;) Accordingly, respondents claim, there are no secrets in this type of litigation and all the information is "generally known."

Respondents make a strong argument that much of the information "relating to the representation" of GM is generally known. Advice and information about how to conduct lemon law litigation against various manufacturers, including GM, along with form pleadings and interrogatories, proliferate in legal periodicals, practice manuals, law review articles, textbooks, and through bar association conferences and publications. However, this is true of just about every type of matter there is to litigate. The information age has not neglected the legal profession, and step-by-step checklists on litigating a particular type of case can be found in every law library and computerized legal database in the country. The fact that this type of information is publicly available does not make "information relating to the representation" of GM "generally known." Rule 1.9(a)(2) also contemplates knowledge of the decision-making processes of GM personnel regarding legal claims, the internal workings of the GM organization, the particular personalities, expectations, negotiating techniques, and management styles of GM personnel, historical

and technical information regarding GM vehicles, and GM claims handling processes and procedures. This type of information is protected by the attorney-client relationship whether the matter involves complicated legal issues, such as in antitrust law, or whether it involves the "*pro forma*" litigation of lemon law claims.[13] It would be available to someone whose extensive experience as local counsel for GM on over fifty lemon law matters has resulted in a close, professional working relationship with GM legal and technical personnel and who was trusted enough for his firm to be one of only a few granted blanket settlement authority by GM, but it is not generally known.

Moreover, the fact that plaintiff's counsel has litigated hundreds of cases against GM, generally considers himself knowledgeable of GM's settlement philosophy, and considers that philosophy to be elementary, does not lead to the conclusion that all is well under Rule 1.9(a)(2). Mr. Silverman points out that approximately half of the claims settle through the early resolution program before being referred to local counsel, and he emphasizes his role in this process and his direct contact with GM legal and technical personnel. However, the fact that half of them do *not* settle belies Mr. Silverman's assertion that GM's settlement process is merely a one-dimensional information exchange. Despite Mr. Silverman's exhaustive coverage of the steps that GM takes to settle each and every case, he has not shed light on the reasons why half of them do not settle through the early resolution program. In the absence of any sort of acknowledgement by GM that Mr. Silverman, through his experience in litigating cases against GM, has gained knowledge of confidential information, counsel's personal opinion that he is privy to his opponent's settlement strategies is not a sufficient showing to demonstrate to the court that information relating to the representation of GM is "generally known." The court is certain that many a litigator, if asked, would be similarly confident of the extent of his or her knowledge of an adver-

---

**13.** Despite respondents' repeated characterization of their work as "pro forma," the court does not necessarily share that view and is left to wonder what hourly rate is billed on respondents' fee applications for these "pro forma" services.

sary's legal strategies. For these reasons, the court finds that RPC 1.9(a)(2) would mandate Mr. London's disqualification.

### C. RPC 1.9(b)—"Appearance of Impropriety"

Even if there is no actual conflict of interest, disqualification is warranted if the subsequent representation creates an "appearance of impropriety," as that standard is used in RPC 1.7. An appearance of impropriety exists where "an ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients." RPC 1.7(c). This provision expressly preserves the common law decisions of New Jersey courts that analyzed conflicts of interest under an "appearance of impropriety" standard prior to its 1984 codification. *Id.*

The "appearance doctrine," as it is often called by the many New Jersey courts that have considered its application, has been heavily litigated and artfully described. It is intended "not to prevent any actual conflicts of interest but to bolster the public's confidence in the integrity of the legal profession." *In Re Advisory Opinion on Professional Ethics No. 569,* 103 N.J. 325, 330, 511 A.2d 119, 122 (1986). It must be "something more than a fanciful possibility. It must have some reasonable basis." *Higgins v. Advisory Comm. on Prof. Ethics,* 73 N.J. 123, 129, 373 A.2d 372, 375 (1977). Whether an appearance of impropriety exists is not to be determined from the point of view of the attorney or the court, rather, it is the "viewpoint of the public from which this Court has chosen to judge whether particular conduct would constitute the appearance of impropriety. We must view the conduct as an informed and concerned private citizen and judge whether the reputation of the Bar would be lowered if the conduct were permitted.'" *In re Opinion No. 569,* 103 N.J. at 331, 511 A.2d at 122; *In re Advisory Opinion on Professional Ethics No. 415,* 81 N.J. 318, 325, 407 A.2d 1197, 1200 (1979). What the application of the appearance doctrine comes down to is a careful consideration of all the relevant facts and circumstances to determine what a reasonable person would perceive as proper or improper. Although the appearance doctrine is not recognized in other jurisdictions, including Pennsylvania, it remains of vital importance to the New Jersey bar. *See In Re Advisory Opinion on Professional Ethics No. 621,* 128 N.J. 577, 594, 608 A.2d 880, 888 (1992) ("We recognize that there has been controversy surrounding the imposition of the 'appearance of impropriety' standard and that it is not universally accepted. Nonetheless, our adoption of RPCs that explicitly impose that standard makes clear that it still applies in New Jersey").

The Appellate Division in *In Re County of Bergen,* 268 N.J.Super. 403, 633 A.2d 1017 (App.Div.1993), was called upon to determine whether special counsel for the County of Bergen should have been disqualified pursuant to RPC 1.9 due to his former representation as bond counsel for the Bergen County Utilities Authority ("BCUA"), which in *In Re County of Bergen* was the subject of an adversarial dissolution proceeding brought by the County of Bergen. The court found that even if there was not a "clear conflict of interest," the successive representation created an appearance of impropriety because of counsel's "full access to the BCUA's files and records" while he was bond counsel, despite the absence in the record of any evidence indicating that counsel had ever violated the rights of BCUA. *Id.* at 409–410, 633 A.2d at 1020–21.

In *G.F. Industries v. American Brands, Inc.,* 245 N.J.Super. 8, 583 A.2d 765 (App. Div.1990), the court found an appearance of impropriety where counsel for a parent company, who had previously represented that parent company and its subsidiary in the sale of the subsidiary to G.F. Industries, subsequently aided in the defense of that parent company in a suit brought by G.F. Industries and the subsidiary, alleging misrepresentation in the sale of the condition of some of the subsidiary's assets. After noting that "New Jersey has chosen to strictly construe R.P.C. 1.9," the court found an appearance of impropriety where counsel had frequent, direct contact with the subsidiary for many

years, represented it in a variety of matters, and was very familiar with its files and facilities. *Id.* at 13, 15–16, 583 A.2d at 768–69.

The New Jersey Supreme Court in *In Re Cipriano*, 68 N.J. 398, 346 A.2d 393 (1975), finding an appearance of impropriety in a lawyer's current representation of a landlord against his tenants in dispossession proceedings where the lawyer had previously represented those same tenants against the landlord in matters arising from the tenancy, emphasized the view taken by the public regarding a lawyer's decision to sue his former client:

> The impropriety of taking a case against a former client is not based solely on necessity for disclosure of confidential communications. If the former client has any reason to feel aggrieved, the necessity of maintaining proper public relations for the bar and of avoiding the appearance of wrongdoing should cause the attorney to refuse to accept employment in a capacity adverse to the interests of a former client.

*Id.* at 403, 346 A.2d at 395.

These cases indicate, both by clear directive and by decision, that New Jersey holds its attorneys to strict compliance with the standards set forth in the RPC, and it takes very seriously its role in upholding the integrity of the New Jersey bar in order to maintain a solid measure of public confidence in the legal profession.

Mr. London represented GM for approximately five years while at the Lavin and McBreen firms. During that time, he worked on over fifty lemon law cases, gaining extensive knowledge and experience in GM vehicles, the GM organization, the GM decision-making process and hierarchy, and GM's approach to litigating or settling lemon law claims. He worked closely with and formed a close professional relationship with GM legal and technical personnel, and had access to GM's electronic mail system. Ms. Adams trusted Mr. London "implicitly" and provided him with information over the course of their professional relationship with the expectation that any confidences and secrets would be protected by the attorney-client relationship and Mr. London's ethical obligations to GM. He now is employed in a law firm of five attorneys who work almost exclusively on lemon law matters against many manufacturers, including GM. The record indicates that GM is a large source of revenue for Kimmel & Silverman, and all of the revenue generated from GM is deposited into a general fund from which the salaries of the three Kimmel & Silverman associates are paid. It is reasonable to assume that Mr. London derives at least part of his salary from lawsuits filed against his former client.

Despite the fact that Mr. London never represented GM on cases in New Jersey, and even assuming that Mr. London is not going to work on cases against GM, that Mr. Silverman has learned much of GM's settlement and litigation style, and that the fundamentals of lemon law litigation are available within the public domain, the court finds that Mr. London's five years of extensive involvement in the defense of GM lemon law claims would inevitably create a strong perception on the part of the public of knowledge of GM confidences.

Although the court has no reason to believe that Mr. London and the firm of Kimmel & Silverman would intentionally disseminate confidential information learned during the course of Mr. London's representation of GM, the appearance doctrine is in place to protect the public's perception of the legal profession, and the New Jersey bar in particular, not to castigate an individual lawyer's conduct. As stated by the court in *State v. Rizzo*, 69 N.J. 28, 350 A.2d 225 (1975):

> [A] lawyer must avoid even the appearance of impropriety, ... to the end that the image of disinterested justice is not impoverished or tainted. Thus it is that sometimes an attorney, guiltless in any actual sense, nevertheless is required to stand aside for the sake of public confidence in the probity of the administration of justice.

*Id.* at 30, 350 A.2d at 226. Accordingly, the court finds that Mr. London's employment with Kimmel & Silverman creates an impermissible appearance of impropriety under RPC 1.9(b).

### III. *DISQUALIFICATION OF KIMMEL & SILVERMAN*

 Kimmel & Silverman argue that even if Mr. London would be disqualified

from representing the plaintiffs, he has no intention of ever bringing suit against GM in New Jersey, and the ethics screen that currently exists within their firm effectively prevents Mr. London from inadvertently or intentionally spreading GM confidential information and protects the entire firm from disqualification. Respondents claim that they have the "absolute right" to screen Mr. London, citing a number of opinions by the New Jersey Advisory Committee on Professional Ethics. (Resp.Supp.Brief, at 20.) *See* Expert Report of David H. Dugan, III, Esquire; Report of James C. Schwartzman, Ex. P.

The use of "Chinese walls" or "cones of silence" as effective prophylactic mechanisms has been endorsed by a few courts in response to what was perceived as harsh results of strict application of the RPC. *See Schiessle v. Stephens,* 717 F.2d 417 (7th Cir. 1983); *Nemours Foundation v. Gilbane, Aetna, Federal Insur.,* 632 F.Supp. 418 (D.Del. 1986); *INA Underwriters Insur. Co. v. Rubin,* 635 F.Supp. 1 (E.D.Pa.1983). At least two states have codified the use of screening in their RPC. *See* Pa. RPC 1.10(b); Ill. RPC 1.10(b).

Disciplinary rules, however, are particular to each state, and, as stated earlier, this court must look to the interpretation given to the RPC by the courts of New Jersey. Unlike Pennsylvania's version of RPC 1.10, the rule in New Jersey does not specifically provide for the use of ethics screens. After a careful review of the law in New Jersey, this court finds that the type of ethics screen currently in place at Kimmel & Silverman has not been recognized by the New Jersey courts.

The circumstances in which New Jersey courts have expressly permitted ethics screens are limited to those involving former government attorneys. In *Ross v. Canino,* 93 N.J. 402, 461 A.2d 585 (1983), the New Jersey Supreme Court allowed a firm to screen a former Attorney General from a case in which the firm represented a plaintiff in a civil suit where divisions of the Department of Law and Public Safety had investigated matters relating to the suit while the former Attorney General was still in office.

In doing so, the court found that the former Attorney General had no involvement with the investigation, other than notification of a subpoena being served upon an attorney, which was standard procedure in the Attorney General's office. And, although as Attorney General he had ultimate responsibility over all the cases within the Department, the size of the Department, the number of cases that were before it each year, and the number of immediate supervisors on every case made it unreasonable to impute to the Attorney General specific knowledge regarding every case. Thus, the court found that there was not even an appearance of impropriety in the continuing representation of the plaintiff by the firm. Nevertheless, because government attorneys are "subject to even closer scrutiny than private attorneys," and to assuage any possible concerns over diminished confidence in the integrity of the bar "which is especially acute when the government attorney has been the chief law enforcement officer in the State," the court held that the former Attorney General should be subject to a screen. *Id.* at 409–10, 461 A.2d at 589–90. As part of this screen, the former Attorney General was prohibited from communicating with other members of the firm regarding the subject suit and he could not share in the fees generated by the suit. *Id.* The court stated that "[w]hile erecting a 'Chinese wall' around a former government attorney may not be required in some cases or sufficient in others, we believe it to be an appropriate response in this case." *Id.* The only cases the court cited in support were those from other jurisdictions in which an ethics screen was permitted for a former government attorney. *Id. See also Marxe v. Marxe,* 238 N.J.Super. 490, 570 A.2d 44 (Ch.Div.1989) (law firm permitted to screen judge's former law clerk from current case before judge).

Successive government and private attorney employment is governed by RPC 1.11 which prohibits a lawyer from representing a private client in connection with a matter in which the lawyer participated "personally and substantially," or about which the lawyer gained confidential information, or over which the lawyer retained "substantial re-

sponsibility" as a public officer or employee. RPC 1.11(a). In the absence of such participation, but where the lawyer's representation may still create an appearance of impropriety, the rule expressly allows the use of a screen. RPC 1.11(b). The rule essentially is a codification of the holding and reasoning in *Ross v. Canino.*

The rule by which Kimmel & Silverman would be disqualified by reason of Mr. London's disqualification—and the rule under which Kimmel & Silverman claim an ethics screen is accepted—is RPC 1.10.[14] This rule, otherwise known as "imputed disqualification," requires a court to disqualify an entire firm when any attorney in that firm would be prohibited from representing a client by "RPC 1.7, RPC 1.8, RPC 1.9 or RPC 2.2." RPC 1.10(a). Conspicuously absent from RPC 1.10 is imputed disqualification where an attorney would be prohibited from representing a client under RPC 1.11(a), and this absence logically prevents an analogy from being made between Rules 1.10 and 1.11. Express mention of an ethics screen in RPC 1.11 does not lead to its incorporation into RPC 1.10.

More significant an absence is language similar to that of Pennsylvania's version of RPC 1.10 which does not impute disqualification to an entire firm as long as the "disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom." Pa. RPC 1.10(b)(1). When Mr. London researched his ethical obligations regarding his switch of employment to Kimmel & Silverman, it is undisputed that he researched only Pennsylvania law and consulted only the Pennsylvania Bar Association. While it may be true

that the ethics screen implemented at Kimmel & Silverman is sufficient under Pennsylvania law, that issue is not before this court. Rather, the issue is the viability of such an ethics screen in New Jersey for purposes of the twenty cases that Kimmel & Silverman have filed in this District.

■ The most logical conclusion to be drawn from New Jersey's version of Rules 1.10 and 1.11, along with New Jersey case law, is that the language of RPC 1.10 is absolute, and an ethics screen designed to prevent the imputed disqualification of an entire firm is only recognized in the case of a former government attorney where there is no direct conflict of interest but where his or her representation would otherwise create an appearance of impropriety. In the absence of New Jersey precedent which creates an alternative to imputed disqualification in the form of an ethics screen under RPC 1.10, this court will not recognize the validity of Kimmel & Silverman's screen where Mr. London would be disqualified under Rule 1.9(a)(1), Rule 1.9(a)(2), and Rule 1.9(b).[15]

The opinion of the New Jersey Advisory Committee cited by the respondents which extended the use of ethics screens to private attorneys in asbestos litigation has not been reviewed by the New Jersey Supreme Court and is, nevertheless, distinguishable. In *Opinion 525,* 113 N.J.L.J. 365 (1984), the Advisory Committee considered the use of a screen for attorneys involved in toxic-asbestos litigation. The Committee recognized the significant amount of asbestos litigation that was taking place in this country. Certain aspects of this type of litigation made it unique and virtually impossible under a strict application of the ethics rules for lawyers to change firms. An asbestos lawsuit involves

---

**14.** The comment to RPC 1.10 states that paragraph (a) operates only among lawyers currently associated in a firm, while paragraph (b) applies when a lawyer moves from one firm to another. However, the ABA comments have not been adopted by the New Jersey Supreme Court and are only to be used as guidance. Sylvia Pressler, *New Jersey Court Rules* 328 (1995 ed.). Because both the New Jersey Supreme Court in *Dewey* and the Appellate Division in *Lawler v. Isaac,* 249 N.J.Super. 11, 592 A.2d 1 (App.Div.1991), have applied paragraph (a) to a "side-switching" attorney, this court will disregard the comment's direction and consider the application of RPC 1.10(a). *See Dewey,* 109 N.J. at 217, 536 A.2d at

251 ("Because of our conclusion that RPC 1.10(a) is the relevant provision in this case, we need not address the parties' arguments concerning RPC 1.10(b) and (d) . . .").

**15.** The court finds that Kimmel & Silverman would be disqualified under paragraph (b) of RPC 1.10, as well. The cases are "substantially related matters" to those in which Mr. London previously represented GM whose interests are materially adverse to the plaintiffs, and Mr. London acquired information protected by RPC 1.9(a)(2) that is material to these cases.

numerous manufacturers, distributors, and suppliers, and some issues in the cases are common to many parties in a specific case, but not to others. Most of the defense law firms and many of the plaintiffs' law firms in New Jersey were involved in asbestos litigation, and would remain involved for a number of years. The Committee also noted that the cases came in clusters involving numerous workers at one site, and a lawyer may be involved only with the facts relating to that site, or a lawyer may only have limited contact in other ways, such as research or taking depositions of claimants. In these circumstances, the Committee expressly found that because of the unique nature and extent of asbestos litigation, public policy considerations justified treating it differently from other types of litigation by allowing the use of ethics screens to prevent asbestos lawyers from becoming "professional pariahs." [16]

Lemon law litigation does not share these characteristics with asbestos litigation. It is not so pervasive that nearly all of the law firms in the New Jersey area are in some way connected with it. The cases have a life expectancy of six to nine months and usually involve one or two plaintiffs and one manufacturer. The issues are limited and common to all cases, and a lawyer handling a lemon law case usually has responsibility for all aspects of the case. As there would be no general prohibition on Mr. London changing jobs among defense firms or into other types of litigation, there is not the same concern of him becoming a "professional pariah." The public policy considerations that justified the use of ethics screens in *Opinion 525* do not apply with any force to the instant situation.[17]

Recognition of screening mechanisms is not uniform among the states and is heavily dependent upon each state's public policies with respect to the regulation of attorneys practicing within its borders. The state of

**16.** The Committee set forth a list of factors to consider in determining the appropriateness of an ethics screen. These include:

(1) The size of the prior and succeeding law firm;

(2) The extent of the relationship held by the present affiliate with a former law firm;

(3) The degree of responsibility held by the present affiliate with a former law firm;

(4) The length of time spent with the former firm;

(5) The kind of work done, whether toxic tort or other law work;

(6) If engaged in toxic tort work, the degree of involvement—whether extensive, peripheral or incidental only or whether in greater depth;

(7) The law work with which the affiliate will be involved or is involved;

(8) The passage of time involved, i.e., the time elapsed between when the affiliate last had an involvement with a case substantially related to the one at issue;

(9) The substantiality or insubstantiality of the relationship between the cases and the issues therein;

(10) Other circumstances having a reasonable bearing on actual conflict or perceived impropriety.

The court suggests, without deciding, that given the small size of Kimmel & Silverman, the fact that their work consists almost exclusively of lemon law litigation, and Mr. London's extensive background in lemon law litigation on behalf of GM, the application of these factors may well indicate that the ethics screen implemented at Kimmel & Silverman is insufficient.

Of note is the fact that Kimmel & Silverman is a firm of only five attorneys. See the opinion in *United States v. Stalks*, 1994 WL 606060 (D.N.J. 1994), where Judge Wolin stated: "Often a law firm will attempt to use screening measures to obviate a conflict of interest. This is not appropriate in this case. First, the smaller the firm, the less likely such screening measures will be effective. In several cases, courts have disapproved of screening measures in small firms. *Yaretsky v. Blum*, 525 F.Supp. 24 (S.D.N.Y.1981) (less than thirty lawyers in the firm); *Re Asbestos Cases*, 514 F.Supp. 914 (E.D.Va.1981) (five lawyers in the firm)." *Id.* at *6–7.

**17.** The remaining Advisory Committee opinions cited by the respondents do not support their position. *Opinion 564*, 116 N.J.L.J. 204 (1985), did not decide whether a Chinese wall was permitted in the context of a law firm's proposed employment of a former in-house insurance defense lawyer where the law firm represented plaintiffs against that insurance company; it only noted that the law firm proposed to implement one. *Opinion 660*, 130 N.J.L.J. 659 (1992), merely emphasized that Chinese walls are accepted in the employment of a former government attorney. *Opinion 665*, 131 N.J.L.J. 1074 (1992), noted that public policy considerations justified the use of a Chinese wall in situations involving non-lawyers, such as paralegals. *Opinion 654*, 129 N.J.L.J. 514 (1991), does not, contrary to the respondents' interpretation, endorse the use of Chinese walls in New Jersey.

New Jersey has demonstrated that its policy is to ensure strict compliance with its RPC, and those RPC provisions dealing with conflicts of interest go beyond those of other states. An example is New Jersey's steadfast adherence to the appearance of impropriety doctrine despite recommendations by the Debevoise Committee [18] and the trend in other states towards abandoning the doctrine. Many state courts have underscored the general ineffectiveness of ethics screens, and this court notes that temptation is pervasive, policing is difficult, and violations are almost impossible to prove. *See, e.g., Henriksen v. Great American Savings and Loan,* 11 Cal.App.4th 109, 14 Cal.Rptr.2d 184 (1992); *Nebraska v. Buckley,* 244 Neb. 36, 503 N.W.2d 838 (1993); *Towne Dev. of Chandler, Inc. v. Superior Court,* 173 Ariz. 364, 842 P.2d 1377 (Ct.App.1992); *Lansing–Delaware Water District v. Oak Lane Park, Inc.,* 248 Kan. 563, 808 P.2d 1369 (1991). *See also* Monroe Freedman, *Conflict–Case Screening: It is Only a Gimmick,* 142 N.J.L.J. 764 (November 27, 1995). Keeping these considerations in mind, this court will not read into RPC 1.10 the implicit meaning that Kimmel & Silverman seek to give it and recognize the effectiveness of an ethics screen where the New Jersey courts have not.

## IV. COMPETING INTERESTS

█ *Dewey* instructs that the court's final task in a disqualification motion is to balance the competing interests, weighing the need to maintain the highest standards of the legal profession against a client's right to freely choose its counsel. *Dewey,* 109 N.J. at 218, 536 A.2d at 251.

Kimmel & Silverman assert that it is the only firm prosecuting a significant number of lemon law cases against automobile manufacturers in New Jersey, and is one of two firms doing so in Pennsylvania. They submit the affidavits of several New Jersey plaintiffs who state that they are pleased with the services provided by Kimmel & Silverman, and they do not believe that they could obtain similar representation, if any at all, in

such matters if the firm were disqualified. (Pl.Brief, Ex. D–F.) These individuals were prepared to testify at the hearings in accordance with their affidavits. Kimmel & Silverman argue that GM is brandishing its corporate might against the claims of powerless individuals who only seek an honest bargain in the purchase of a GM automobile, and the court should not allow the interests and rights of these individuals to be prejudiced by GM's smear campaign against Kimmel & Silverman.

The court understands the plaintiffs' desire to continue to be represented by Kimmel & Silverman. The firm certainly possesses extensive experience in litigating lemon law claims and has demonstrated its ability to protect its clients' interests while generating substantial revenue for itself. The firm's phenomenal success in the lemon law area in Pennsylvania is apparent from the record and has even been documented in a recent article in *The Philadelphia Inquirer.* Julie Stoiber, *Lawyers Build a Sweet Practice out of Lemon Laws,* PHILA. INQUIRER, Aug. 14, 1995, at F1. However, amidst the surge of lemon law claims, the increasing workload, the twelve-hour workdays, and the planned expansion of the firm into surrounding geographical areas, all of which spawned the need to hire one or more additional attorneys, Mr. Silverman and Mr. Kimmel, along with Mr. London, may not have stopped to consider their ethical obligations imposed by states other than Pennsylvania.

The primary reason that the court in *Dewey* allowed the firm to continue to represent the plaintiffs despite the fact that RPC 1.9 and RPC 1.10 warranted disqualification was that the litigation had been proceeding for several years, plaintiff's counsel had invested almost 2,000 hours in litigating the case, and the complexity of the issues made it highly unlikely that new counsel could master the case in time for the trial that was quickly approaching. "We believe, ... that an order disqualifying counsel on the eve of trial would do more to erode the confidence of the

---

**18.** The New Jersey Supreme Court Committee on the Model Rules of Professional Conduct, referred to as the "Debevoise Committee," made certain recommendations to the New Jersey Supreme Court for the court to take into account when it adopted the RPC. *See* 112 N.J.L.J., July 28, 1983, Supp.

public in the legal profession and the judicial process than would an order allowing the firm to continue its representation of the plaintiff." *Dewey,* 109 N.J. at 219, 536 A.2d at 252. The court emphasized that "only in extraordinary cases should a client's right to counsel of his or her choice outweigh the need to maintain the highest standards of the profession." *Id.,* at 220, 536 A.2d at 253.

Those circumstances do not present themselves here. As has been repeatedly stated by Mr. Silverman, Mr. Kimmel, and Mr. London during the hearings and in all of their motion papers and affidavits, the issues in lemon law litigation are not complex and do not require a significant amount of legal analysis or novel pleading. The cases themselves have a lifespan of approximately six to twelve months. There is no reason why other firms in New Jersey could not just as adequately protect the plaintiffs' interests in lemon law litigation. A person's right to retain counsel of his or her choice is limited in that "there is no right to demand to be represented by an attorney disqualified because of an ethical requirement." *Dewey,* 109 N.J. at 218, 536 A.2d at 251–52 (quoting *Reardon v. Marlayne, Inc., supra,* 83 N.J. at 477, 416 A.2d 852). Under New Jersey law, Mr. London must be disqualified under RPC 1.9 and that disqualification is imputed to the firm of Kimmel & Silverman through RPC 1.10. This is not the "extraordinary case" referred to in *Dewey* where a client's right to counsel of his or her choice outweighs the need to maintain the highest standards of the profession. Although disqualification of Kimmel & Silverman may cause inconvenience and some delay to the plaintiffs, the harm to the public interest if Kimmel & Silverman is permitted to remain as counsel for plaintiffs outweighs the prejudice to the plaintiffs.

The court is aware of and must be sensitive to the fact that motions for disqualification are often filed to improperly delay proceedings and to deny a party the counsel of her choice. *See Fred Weber, Inc. v. Shell Oil Co.,* 566 F.2d 602 (8th Cir.1977), *cert. denied,* 436 U.S. 905, 98 S.Ct. 2235, 56 L.Ed.2d 403 (1978); *Ferranti International plc v. Clark,* 767 F.Supp. 670 (E.D.Pa.1991); *North Star Hotels Corp. v. Mid–City Hotel Assoc.,* 118 F.R.D. 109 (D.Minn.1987). Many representations were made during the hearing that GM's motivation for filing this motion was to drive Kimmel & Silverman out of business because of their great success in litigating lemon law claims against GM. (Silverman, 8/17/95, at 185–87, 199–200; 8/18/95, at 68.) However, the factual record shows that GM filed this motion on July 3, 1995, very soon after it became known that Kimmel & Silverman hired Mr. London on May 31, 1995. There is no evidence before the court that GM sought to unduly delay these proceedings or harass the respondents by filing this motion.

## V. CERTIFICATION

Respondents ask this court to certify this order as a controlling question of law immediately appealable to the United States Court of Appeals for the Third Circuit under 28 U.S.C. § 1292. *See Richardson–Merrell, Inc. v. Koller,* 472 U.S. 424, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985); *E.F. Hutton & Co. v. Brown,* 305 F.Supp. 371 (S.D.Tex.1969). The court denies the respondents' request. An appeal of a Magistrate's order is governed by Local Rule 40D; any arguments in support of certification to the Third Circuit should be directed to the District Judge.

## CONCLUSION

For the reasons discussed above, the court finds that Mr. London would be disqualified from representing the plaintiffs in the matters that are the subject of this motion pursuant to RPC 1.9(a)(1), 1.9(a)(2), and 1.9(b). The firm of Kimmel & Silverman is also disqualified pursuant to RPC 1.10.